625 F.2d 379
 104 L.R.R.M. (BNA) 2516, 89 Lab.Cas. P 12,090
 William JENSEN, Edwin Kremer, John Gardella, William Kuyl,
Dominick Bisbano, Lindsay Hoyt, Francis S.
Haggerty, Richard Trippe, Anthony Lore
and Gary D. Lueck, Appellees,
v.
FARRELL LINES, INC., and International Organization of
Masters, Mates and Pilots, AFL-CIO, Appellants,
and
Brotherhood of Marine Officers, District 1, MEBA, AFL-CIO,
and American Federation of Labor and Congress of
Industrial Organizations, Defendants.
 Nos. 641, 817, Dockets 79-7716, 79-7717.
 United States Court of Appeals,
Second Circuit.
 Argued Jan. 21, 1980.
Decided May 12, 1980.
 
 Alexander Gigante, Proskauer, Rose, Goetz & Mendelsohn, New York City, for appellant Farrell Lines, Inc.
 Seymour M. Waldman, New York City (Waldman & Waldman, Burton M. Epstein, New York City, of counsel), for appellant International Organization of Masters, Mates and Pilots, AFL-CIO.
 Murray A. Gordon, Gordon & Shechtman, P. C., New York City, for appellees.
 Before OAKES, VAN GRAAFEILAND and NEWMAN, Circuit Judges.
 OAKES, Circuit Judge:
 
 
 1
 This appeal, by an employer and a union, is from a decision of the United States District Court for the Southern District of New York, Robert W. Sweet, Judge, holding that, once an employer agrees to bargain collectively with supervisors who have no statutory right to organize, they have a freedom of association First Amendment right to a determination that the union representing them is favored by a majority of its members. Jensen v. Farrell Lines, Inc., 477 F.Supp. 335 (S.D.N.Y.1979). We are not persuaded that there was state action here, nor are we persuaded that, even if there were, the plaintiff-appellee supervisors had any such First Amendment right. We therefore reverse.
 
 FACTS
 
 2
 Plaintiff-appellees are ten licensed deck officers and engineers who are supervisory employees in the maritime shipping industry. They were all employed for a substantial period of time aboard certain vessels formerly owned and operated by American Export Lines, Inc. (AEL). They were also members of the Brotherhood of Marine Officers, District One, National Marine Engineers Beneficial Association, AFL-CIO (BMO), a defendant below but not a party here.
 
 
 3
 Defendant-appellant employer is Farrell Lines, Inc. (Farrell), a United States flag shipping line operating merchant cargo and bulk carriage vessels, which acquired AEL's twenty-five owned or operated ships in a sale pursuant to a reorganization plan resulting from proceedings under Chapter XI of the Bankruptcy Act, 11 U.S.C. §§ 701-799 (1976). Defendant-appellant union is the International Organization of Masters, Mates and Pilots, AFL-CIO (MMP).
 
 
 4
 Appellees are only ten out of approximately 180 former AEL supervisors who were members of and exclusively represented by BMO. Farrell owned or operated fourteen of its own ships immediately prior to its acquisition of AEL's vessels; as such, it was a party to a multi-employer collective bargaining agreement with MMP. The agreement provided that all licensed deck officers employed by Farrell must be members of MMP.
 
 
 5
 Upon Farrell's integration of the AEL ships into its own operations, Farrell signed an agreement with BMO on March 28, 1978, continuing the AEL-BMO collective bargaining agreement. Later, Farrell negotiated with BMO a wage increase for the employees covered under the old AEL-BMO contract. Shortly after the bankruptcy purchase, however, MMP asserted that it, not BMO, was entitled to represent all licensed deck officers employed by Farrell, and through its parent union (the International Longshoremen's Association) initiated proceedings before the AFL-CIO under Article XX of the AFL-CIO Constitution. BMO, through its parent union, counterclaimed, asserting BMO's representation rights. The AFL-CIO arbitrator found that the Farrell purchase constituted an "accretion" of the AEL fleet to the Farrell fleet and that, primarily because the MMP contract provided for accretions, whereas the BMO contract did not, the MMP contract was to be given effect. This decision was affirmed in an appeal to the AFL-CIO Executive Council.
 
 
 6
 Farrell then informed the former AEL supervisors that, as a condition of continued employment with Farrell, they would have to leave BMO and join MMP, Farrell also discontinued its pension, health, and vacation pay contributions to BMO under the old AEL contract and began to make all contributions to the MMP plan.
 
 
 7
 MMP on its part offered the former AEL supervisors, including appellees, membership in MMP on terms that, among other things, granted them the highest available seniority status of three grades accorded employees under the MMP contract, for jobs aboard all former AEL ships. Many of the former AEL supervisors, but not appellees, accepted MMP's offer.
 
 
 8
 On March 12, 1979, appellees received notice of the Farrell decision abrogating the BMO collective bargaining agreement, when their former AEL ship, the C/V Staghound, the first ship to return to the United States following the decision, docked in Baltimore, Maryland. After reaching New York several days later, appellees were informed of the effect of the AFL-CIO Article XX decision and the requirement that they join MMP to continue employment with Farrell. Upon refusing to sign MMP membership cards and leave the vessel, appellees were removed from the Staghound by the New York City police, and this action followed.
 
 THE DECISION BELOW
 
 9
 In the proceedings below, appellees made three basic claims, the first two of which were rejected by the district court and are not in contention here.[1] The third claim, here on appeal, is that Farrell's enforcement of the Article XX decision is a violation of appellees' First Amendment right to freedom of association, because it forces them to join a union that has not been freely selected by them or by a majority of Farrell's deck officers as a condition of their continued employment. After evidentiary hearings on an application for preliminary relief, the court below, properly exercising its discretion under Fed.R.Civ.P. 65(a)(2), ordered that the trial of the action on the merits be advanced and consolidated with the preliminary injunction hearing. The court found, 477 F.Supp. at 346, correctly, that subject matter jurisdiction over the constitutional claim existed under 28 U.S.C. § 1331. Bell v. Hood, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946); Evans v. American Federation of Television and Radio Artists, 354 F.Supp. 823, 837 (S.D.N.Y.1973), rev'd on other grounds sub nom. Buckley v. American Federation of Television and Radio Artists, 496 F.2d 305 (2d Cir.), cert. denied, 419 U.S. 1093, 95 S.Ct. 688, 42 L.Ed.2d 687 (1974). The court below also held, 477 F.Supp. at 347-48, that appellees had standing to bring their constitutional claim, despite appellant's argument below that MMP benefits may have equaled or exceeded those of BMO and despite appellees' opportunity to join MMP. The court found that appellees had shown a definite injury and personal stake in the outcome, occasioned by their loss of employment, and that they had lost a valuable right of being represented by a majority-selected union. The court posited a further independent basis for standing in that there were significant differences between the operation of the two collective bargaining agreements relating to vacation benefits, seniority, selection of billets, and overtime payments, among other things. Id. at 348. The opinion noted that the third claim in effect challenged the maritime industry's practice of engaging in pre-hire collective bargaining contracts, i. e., a contract between a shipowner and a union requiring supervisory employees to join that union before any ships are built or supervisors are hired. Id. at 350.
 
 
 10
 Before reaching the merits of the constitutional claim, the district court found that the requisite state action existed, whether in terms of "interdependence," "symbiosis," or "nexus." Id. at 350-53; see Jackson v. Metropolitan Edison Co., 419 U.S. 345, 351, 357-58, 95 S.Ct. 449, 453, 456-457, 42 L.Ed.2d 477 (1974); Burton v. Wilmington Parking Authority, 365 U.S. 715, 722, 725, 81 S.Ct. 856, 860, 861, 6 L.Ed.2d 45 (1961). See also Graseck v. Mauceri, 582 F.2d 203, 209-10 (2d Cir. 1978), cert. denied, 439 U.S. 1129, 99 S.Ct. 1048, 59 L.Ed.2d 91 (1979). The court relied on several elements: (1) the fact that, in the maritime industry, there is a government operating subsidy to the employer resulting from the differential between wages paid union members and wages paid employees performing similar functions in foreign fleets; (2) evidence indicating that Farrell received a cumulative sum exceeding $56 million in subsidies for operating costs, principally costs under collective bargaining contracts; (3) proof that Farrell not only received construction-differential subsidies for the construction of its ships from the United States government, but also received guarantees of its bonds and notes issued to provide financing.[2]
 
 
 11
 Furthermore, the court noted that routes for which subsidies are received must be approved by the Government and that the United States regulates extensively the manning and wage scales of officers and seamen serving aboard Farrell ships. Federal law provides for Maritime Administration review of the fleetowner's collective bargaining costs before it may receive the so-called operating-differential subsidy. 46 U.S.C. § 1173(b). Finally, the legislative history of the Merchant Marine Act of 1970 establishes that a primary purpose of the subsidies is to ensure a national maritime industry as an element in our national security. See (1970) U.S.Code Cong. & Admin.News, p. 4188. In short, the court concluded that the "merchant marine carries out a specific governmental function of vital interest to the national defense," and that Farrell "is a heavily subsidized private firm which has had its decisionmaking power greatly circumscribed by an extensive governmental regulatory scheme." 477 F.Supp. at 353 (footnotes omitted).
 
 
 12
 Reaching the merits, the court held that although Congress can deny supervisors the same right to organize that it grants to statutory employees, so that there is no absolute right for supervisory employees to bargain collectively, once an employer agrees to bargain collectively and sets terms and conditions of employment, supervisors have a First Amendment freedom of association right to a determination that the union representing them is majority-chosen. Id. at 353-56. The court took as a given the idea that among the individual rights protected by the First Amendment is the freedom of association. Id. at 353 (citing Abood v. Detroit Board of Education, 431 U.S. 209, 233, 97 S.Ct. 1782, 1798, 52 L.Ed.2d 261 (1977); Runyon v. McCrary, 427 U.S. 160, 175, 96 S.Ct. 2586, 2596, 49 L.Ed.2d 415 (1976); Buckley v. Valeo, 424 U.S. 1, 15, 96 S.Ct. 612, 632, 46 L.Ed.2d 659 (1976) (per curiam); NAACP v. Button, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963); NAACP v. Alabama, 357 U.S. 449, 460, 78 S.Ct. 1163, 1170, 2 L.Ed.2d 1488 (1958). Judge Sweet viewed that freedom as including its converse, the freedom not to associate or be compelled to join in a group or association against one's will, relying upon Wooley v. Maynard, 430 U.S. 705, 714, 97 S.Ct. 1428, 1435, 51 L.Ed.2d 752 (1977) (freedom of speech includes freedom to refrain from speaking), and Railway Employes' Department v. Hanson, 351 U.S. 225, 76 S.Ct. 714, 100 L.Ed. 1112 (1956) (by implication). 477 F.Supp. at 353. First Amendment protection, the court found, extends to and encompasses association in an economic context. Id. at 354 (citing Thomas v. Collins, 323 U.S. 516, 65 S.Ct. 315, 89 L.Ed. 430 (1945)). Then, referring to cases finding statutory infringements of associational rights constitutional, e. g., Abood v. Detroit Board of Education, supra, 431 U.S. at 259, 97 S.Ct. at 1811 (Powell, J., concurring); CSC v. Letter Carriers, 413 U.S. 548, 556, 567, 93 S.Ct. 2880, 2886, 2891, 37 L.Ed.2d 796 (1973); Railway Employes' Department v. Hanson, supra, 351 U.S. at 233-35, 76 S.Ct. at 718-719, the court went on to say that the required balancing is between the seriousness of the restriction on plaintiffs' rights and the governmental interest in leaving the challenged practice intact. 477 F.Supp. at 354. It held that the balance tipped in the employees' favor, on the basis that absent the safeguard of majority representation, the de facto union shop agreement here is overly and unnecessarily restrictive.
 
 
 13
 The relief granted below, id. at 356-57, was the holding of an election or implementation of a process, such as union card authorization, designed to establish the majority status of the unions involved. Analogizing the constitutional right to the statutory right available to nonsupervisory employees, the court declared that the status quo would not be immediately dislodged. Only if it were subsequently determined that MMP is not supported by the majority of the personnel in the relevant fleetwide unit, the court stated, would it be determined that plaintiffs' constitutional rights have been violated. Subsequently, those eligible to vote in an election were declared to be deck officers on the seniority or select list of Farrell or AEL on February 28, 1979, deck officers actually employed on Farrell ships or on paid vacation or paid sick leave, and certain other employees immaterial here.
 
 DISCUSSION
 A. Jurisdiction and Cause of Action
 
 14
 The district court below properly found subject matter jurisdiction under § 1331(a), 477 F.Supp. at 346, since the constitutional claim stated is not "wholly insubstantial and frivolous." Bell v. Hood, supra, 327 U.S. at 682-83, 66 S.Ct. at 776; see Duke Power Co. v. Carolina Environmental Study Group, Inc., 438 U.S. 59, 70, 98 S.Ct. 2620, 2629, 57 L.Ed.2d 595 (1978); Turpin v. Mailet, 579 F.2d 152, 155 n.3 (2d Cir.), vacated on other grounds, 439 U.S. 974, 99 S.Ct. 554, 58 L.Ed.2d 645 (1978). The court also correctly held that a cause of action existed for both declaratory and injunctive relief from the court. 477 F.Supp. at 346 & n.22, 357 n.54. Declaratory relief is expressly authorized under 28 U.S.C. § 2201. Availability of federal equitable relief to remedy constitutional violations has been presumed by the courts. Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388, 404, 91 S.Ct. 1999, 2008, 29 L.Ed.2d 619 (1971) (Harlan, J., concurring). The court in Bell v. Hood, supra, stated that "it is the established practice for this Court to sustain the jurisdiction of federal courts to issue injunctions to protect rights safeguarded by the Constitution . . . . Moreover, where federally protected rights have been invaded, it has been the rule from the beginning that courts will be alert to adjust their remedies so as to grant the necessary relief." 327 U.S. at 684, 66 S.Ct. at 777 (footnotes omitted); see, e. g., Davis v. Passman, 422 U.S. 228, 242-43, 99 S.Ct. 2264, 2275-2276, 60 L.Ed.2d 846 (1979); Porter v. Califano, 592 F.2d 770, 781 (5th Cir. 1979); Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 409 F.2d 718, 723 (2d Cir. 1969), rev'd and remanded on other grounds, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). See generally Dellinger, Of Rights and Remedies: The Constitution as a Sword, 85 Harv.L.Rev. 1532, 1540-43 (1972).[3]
 
 B. State Action
 
 15
 As the opinion for the Court in Hudgens v. NLRB, 424 U.S. 507, 96 S.Ct. 1029, 47 L.Ed.2d 196 (1976), shows, there is no dearth of cases in respect to the question of state action in a First Amendment context. We do know that the constitutional guarantee of free speech extends only to abridgments by federal or state government. See Columbia Broadcasting System, Inc. v. Democratic National Committee, 412 U.S. 94, 114, 93 S.Ct. 2080, 2092, 36 L.Ed.2d 772 (1973). We also know that the concept of what constitutes state action is a blurred one that the Supreme Court itself has had trouble clarifying. See Hudgens, supra, 424 U.S. at 517-20, 96 S.Ct. at 1035-1036 (indicating that Lloyd Corp. v. Tanner, 407 U.S. 551, 92 S.Ct. 2219, 33 L.Ed.2d 131 (1972), which purported to distinguish Food Employees Local 590 v. Logan Valley Plaza, 391 U.S. 308, 88 S.Ct. 1601, 20 L.Ed.2d 603 (1968), actually overruled it, just as Mr. Justice Marshall, dissenting in Lloyd, saw the situation, 407 U.S. at 571, 92 S.Ct. at 2230); Jackson v. Metropolitan Edison Co., supra, 419 U.S. at 349-50, 95 S.Ct. at 453. ("(T)he question whether particular conduct is 'private,' on the one hand, or 'state action,' on the other, frequently admits of no easy answer." (citations omitted)).
 
 
 16
 Generally speaking, there appear to be at least two general approaches that the Court has used to determine whether seemingly private action is in fact state action. One is the state-function approach, in which courts must find that the conduct of the private actor is equivalent to the performing of a state function, or is traditionally associated with sovereignty. It is not enough if the private entity is merely affected with the public interest; it must exercise powers "traditionally exclusively reserved to the State." Id. at 352, 95 S.Ct. at 454.[4]
 
 
 17
 The other general approach is to examine the conduct of the private actor and ask whether the state and the private actor have a "symbiotic relationship," id. at 357, 95 S.Ct. at 457, making them so significantly involved with one another as to render the private actor subject to the constitutional responsibilities of the state. Compare Burton v. Wilmington Parking Authority, supra, 365 U.S. at 725, 81 S.Ct. at 861 (finding state action on the part of a restaurant leasing from a publicly owned and operated parking building), with Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972) (finding no state action on part of private club enjoying benefits of state liquor license). See generally J. Choper, Y. Kamisar & L. Tribe, The Supreme Court: Trends and Developments 1978-1979, at 265-77 (1979) (hereinafter cited as Choper, Kamisar & Tribe); Note, State Action: Theories For Applying Constitutional Restrictions to Private Activity, 74 Colum.L.Rev. 656 (1974). A related inquiry asks "whether there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself." Jackson v. Metropolitan Edison Co., supra, 419 U.S. at 351, 95 S.Ct. at 453. Our opinion in Graseck v. Mauceri, supra, 582 F.2d at 207-12, indicates the difficulty of applying this second general approach in any given case.
 
 
 18
 Following the Court's admonition that "(o)nly by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance," Burton v. Wilmington Parking Authority, supra, 365 U.S. at 722, 81 S.Ct. at 860, we nevertheless hold in this close case that Farrell's actions do not constitute state action.
 
 
 19
 First, we do not find that Farrell performs a state function, recognizing the difficulty of finding state action under the state-function approach. See Choper, Kamisar & Tribe, supra, at 271.[5] Farrell does not exercise powers "traditionally exclusively reserved to the State," Jackson v. Metropolitan Edison Co., supra, 419 U.S. at 352, 95 S.Ct. at 454, "traditionally associated with sovereignty," id. at 353, 95 S.Ct. at 454, or "traditionally the exclusive prerogative of the State," id. See also Flagg Bros. v. Brooks, 436 U.S. 149, 158, 98 S.Ct. 1729, 1734, 56 L.Ed.2d 185 (1978) ("While many functions have been traditionally performed by governments, very few have been 'exclusively reserved to the State.' "). Operating a merchant marine has never been a function exclusively reserved to government. Although federal support of the merchant marine is undoubtedly in the national interest, it does not follow that its operations are exclusively sovereign in nature. Indeed, the Merchant Marine Act itself recognizes the private character of the industry. The Act's Declaration of Policy discusses the necessity of a merchant marine "owned and operated . . . by citizens of the United States." 46 U.S.C. § 1101(c).
 
 
 20
 Appellees' strongest argument, also drawn from the Act's Declaration of Policy, id. § 1101(a), (b), emphasizes the role of the merchant marine as part of our national defense. As described by The Coldwater, 283 F. 146, 148 (S.D.Fla.1922):
 
 
 21
 (I)t is apparent that the United States, in the maintenance and operation of the merchant marine, is not engaged in a purely commercial enterprise, but that, on the contrary, Congress conceived that the establishment and operation of the merchant marine was the exercise of a governmental function of the highest importance . . . .
 
 
 22
 The legislative history of the Merchant Marine Act of 1970 notes: "The merchant marine has been appropriately termed our fourth arm of defense. To permit our security and economy to become totally dependent upon foreign vessels, operated by foreign crews, subject to the wishes of foreign governments would be to run an unacceptable risk." S.Rep.No.1080, 91st Cong., 2d Sess., reprinted in (1970) U.S.Code Cong. & Admin.News, pp. 4188, 4190.
 
 
 23
 The argument, then, suggests that the American merchant marine does serve a state function national defense as a naval and military auxiliary. To this end, the Secretary of Commerce may acquire ships he deems necessary for the purposes of the Merchant Marine Act. 46 U.S.C. § 1125. He may also have new ships constructed or old ones reconditioned, and demise such vessels to private owners for operation on essential trade routes. Id. §§ 1192, 1204.
 
 
 24
 But in all such governmental interventions or takeovers, the Act specifically requires the Government to provide just compensation to the private owner, e. g., id. § 1242, thereby carefully maintaining the distinction between public and private property. The merchant marine is thus quite unlike the United States Navy or Coast Guard, for example, where the fleet is completely owned and operated by the federal government. The very fact that private property is subject to governmental taking cannot be sufficient to make the private owner's actions a state function after all, the Government's eminent domain powers extend to all private property upon a showing of public purpose. U.S.Const. Amend. V; see, e. g., Berman v. Parker, 348 U.S. 26, 75 S.Ct. 98, 99 L.Ed. 27 (1954). While Farrell's operations are certainly affected with the public interest, Farrell evidently does not perform a state function for state action purposes.
 
 
 25
 One must "divide/A hair 'twixt south, and south-west side" to determine whether there is a symbiotic relationship between Farrell and the United States Government, or a close enough nexus between the Government and the challenged action to find state action here. The Court in Burton v. Wilmington Parking Authority, supra, posed the issue as whether "(t)he State has so far insinuated itself into a position of interdependence with (the private actor) that it must be recognized as a joint participant in the challenged activity." 365 U.S. at 725, 81 S.Ct. at 862.[6]
 
 
 26
 We earlier summarized the elements relied on by the district court below to find state action, elements showing the general relationship between the United States Government and the maritime industry's fleet owners. The court's opinion ably detailed the web of governmental subsidy and regulation directed at Farrell. But it is not enough that the private entity receives some governmental funding. See, e. g., Moose Lodge No. 107 v. Irvis, supra, 407 U.S. at 173, 92 S.Ct. at 1971; Graseck v. Mauceri, supra, 582 F.2d at 207-08; Lef-court v. Legal Aid Society, 445 F.2d 1150, 1155 (2d Cir. 1971) (substantial governmental funding of Legal Aid Society inadequate to create state action, absent showing of government control, regulation, or interference). Unlike the situation in Holodnak v. Avco Corp., 514 F.2d 285, 289 (2d Cir.), cert. denied, 423 U.S. 892, 96 S.Ct. 188, 46 L.Ed.2d 123 (1975), where all the land and most of the buildings and equipment were government-owned, as well as the more recent Janusaitis v. Middlebury Volunteer Fire Department, 607 F.2d 17, 21 (2d Cir. 1979), where land, building, and equipment were all government-owned, Farrell's financial dependence is not so complete. Furthermore, in Holodnak, the majority of work at the plant was under government contract, involving the construction of defense-related equipment. 514 F.2d at 289. Here, the construction and operation of American private ships, while undeniably helpful to United States foreign trade and military capability, is less directly connected to the Government. Commonality of economic interests does not itself create a symbiotic relationship. Wahba v. New York University, 492 F.2d 96, 100-01 (2d Cir.), cert. denied, 419 U.S., 874, 95 S.Ct. 135, 42 L.Ed.2d 113 (1974).
 
 
 27
 Nor is it sufficient that there is extensive and detailed regulation of the private conduct. Jackson v. Metropolitan Edison Co., supra, 419 U.S. at 350, 95 S.Ct. at 453. Rather, factors in addition to government funding and regulation must be present. See Weise v. Syracuse University, 522 F.2d 397, 405 (2d Cir. 1975) (funding and regulation insufficient to establish state action). The Government not only does not own Farrell's ships or any of its equipment, but no federal officials are maintained aboard the vessels to supervise or monitor Farrell's operations. See Holodnak v. Avco Corp., supra, 514 F.2d at 289 (substantial government task force maintained at plant to assure contract compliance and product quality, and to audit accounts).
 
 
 28
 If as a general matter the Government has not "insinuated itself into a position of interdependence," Burton v. Wilmington Parking Authority, supra, 365 U.S. at 725, 81 S.Ct. at 862, it has also not acted so as to create a specific nexus between itself and the challenged action. The Government does not pass upon Farrell's recognition of unions as exclusive bargaining agents; even if it did, acquiescence in the decision would probably be insufficient to convert the private action into state action, Flagg Bros. v. Brooks, supra, 436 U.S. at 164, 98 S.Ct. at 1737; Holodnak v. Avco Corp., supra, 514 F.2d at 288. There was no "imprimatur placed on the practice of (Farrell) about which (appellees) complain( )," and the Government has not "put its weight on the side of the (contested) practice by ordering it." Jackson v. Metropolitan Edison Co., supra, 419 U.S. at 357, 95 S.Ct. at 457; see Schlein v. Milford Hospital, Inc., 561 F.2d 427, 429 (2d Cir. 1977) (per curiam). The Government's "power, property and prestige" were not placed behind the actions at issue. Burton v. Wilmington Parking Authority, supra, 365 U.S. at 725, 81 S.Ct. at 861.
 
 
 29
 On balance, then, Farrell's decision to recognize MMP as the exclusive bargaining agent and to discharge appellees following their refusal to satisfy MMP membership requirements was not state action. Since the question is a close one, however, and because reasonable judges could readily decide it another way, we will assume arguendo the requisite state action and reach the merits of the First Amendment claim.
 
 C. First Amendment Rights
 
 30
 Appellees' constitutional claim is that their First Amendment right of association was impermissibly infringed by Farrell's dismissal of them due to their refusal to join MMP and pay union dues an infringement that could be cured only by majority selection of a union as the exclusive bargaining agent for Farrell's deck officers and engineers. We begin our discussion by noting once again that as supervisors, appellees are excluded from the protection of the National Labor Relations Act, 29 U.S.C. §§ 152(3), 164(a). The district court properly held, and appellees do not now disagree, that no federal common law of labor would support a finding of an unfair labor practice constituting by implication a breach of contract actionable under 29 U.S.C. § 185. See note 1 supra.
 
 
 31
 Nor do appellees have a constitutional right to compel Farrell to accede to their preference for union representation. As held in Smith v. Arkansas State Highway Employees, Local 1315, 441 U.S. 463, 99 S.Ct. 1826, 60 L.Ed.2d 360 (1979) (per curiam), a highway commission's refusal to consider employee grievances when filed by a union on behalf of an employee, rather than when filed directly by an employee of the department, does not violate the First Amendment. The Court assumed that if public employers were subject to the same labor laws applicable to private employers, the refusal might constitute an unfair labor practice under the National Labor Relations Act, but held that such impairment of the union's effectiveness in representing the economic interests of its members was nevertheless not prohibited by the Constitution. As the Court noted, "the First Amendment is not a substitute for the national labor relations laws." Id. at 464, 99 S.Ct. at 1827.
 
 
 32
 The later case of Babbitt v. United Farm Workers National Union, 442 U.S. 289, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979), is also instructive. The Court held that Arizona was not constitutionally obliged to provide a procedure pursuant to which agricultural employees, through a chosen representative, might compel their employers to negotiate. Id. at 313, 99 S.Ct. at 2316. Even assuming that Arizona's statutory election procedures might frustrate rather than facilitate democratic selection of bargaining representatives, id. at 300, 99 S.Ct. at 2310, the court said the statute presented "as a general matter no First Amendment problems," id. at 313, 99 S.Ct. at 2316 (footnote omitted).[7]
 
 
 33
 The import of these two cases, then, is that the Constitution poses no inherent barrier to employers who wish to recognize any union they choose or no union at all. See Hanover Township Federation of Teachers Local 1954 v. Hanover Community School Corp., 457 F.2d 456, 460-61 (7th Cir. 1972) (Stevens, J.). Only a statutory command from Congress can yield different results. Thus, Farrell could decide that it would recognize only MMP, or only BMO, or no union of supervisors, and still not violate the Constitution, even though purely contractual obligations might be violated.
 
 
 34
 The district court was willing to accept Farrell's freedoms as outlined above, but argued that the Constitution requires majority selection of a union serving as exclusive bargaining agent. The Supreme Court has established, however, that compulsory financial support of a union shop in its collective-bargaining, contract-administration, and grievance-adjustment activities does not in and of itself impermissibly infringe the right of association. Abood v. Detroit Board of Education, supra, 431 U.S. at 222, 225-26, 97 S.Ct. at 1792, 1794-1795; International Association of Machinists v. Street, 367 U.S. 740, 746-49, 81 S.Ct. 1784, 1788-1789, 6 L.Ed.2d 1141 (1961); Railway Employes' Department v. Hanson, supra, 351 U.S. at 236-38, 76 S.Ct. at 720-721. Appellees have not alleged that MMP would use their dues to promote ideological causes in contravention of their beliefs. If Congress in its judgment can authorize the union shop for employer-employee collective bargaining, without violating the Constitution, Abood v. Detroit Board of Education, supra, 431 U.S. at 222, 97 S.Ct. at 1792, then it is difficult to see how supervisors specifically excluded from coverage under the National Labor Relations Act can allege greater constitutional protection.
 
 
 35
 Appellees argue that "(c)ritical to the judgment in Hanson and Street were the provisions providing for democratic selection by majority vote of the collective bargaining agent," Brief of Appellees at 47, and that Abood emphasizes the majority selection provision under the Michigan labor law, id. at 48. But we do not find such reliance in the Court's opinions, nor do we perceive the safeguard of majority selection as essential to the constitutionality of exclusive union representation. To this effect, the Court in Babbitt v. United Farm Workers National Union, supra, upheld the Arizona statutory election procedure even though it prevented many employees from participating in the election of the collective bargaining agent, 442 U.S. at 294 & n.5, 99 S.Ct. at 2307. The district court implied that the infringement here was greater than in Hanson, Street or Abood because MMP itself had apparently never been chosen by a majority selection process, but rather was a product of the pre-hire system utilized in the maritime industry. 477 F.Supp. at 350 & n.28, 354. We do not agree that such a distinction is dispositive. In Lathrop v. Donohue, 367 U.S. 820, 842-43, 81 S.Ct. 1826, 1837-1838, 6 L.Ed.2d 1191 (1961), compulsory state bar membership imposed by the state's highest court was upheld under the Hanson rationale as not constituting any invalid impingement upon protected rights of association, even though lawyers would never have a chance to vote for or against the bar organization.
 
 
 36
 Moreover, Farrell's recognition of MMP is consistent with nearly two decades of National Labor Relations Board policy supporting the so-called "accretion doctrine," under which the purchaser's union in a shipping industry acquisition has the right to man newly acquired vessels. See NLRB v. National Maritime Union, 486 F.2d 907, 913 (2d Cir. 1973), cert. denied, 416 U.S. 970, 94 S.Ct. 1993, 40 L.Ed.2d 559 (1974); Moore-McCormack Lines, Inc., 139 N.L.R.B. 796, 798-99 (1962). Transfers of ships are fairly common in the industry, and the doctrine serves to avoid constant disruption. See NLRB v. National Maritime Union, supra, 486 F.2d at 913.
 
 
 37
 We also note that MMP agreed to seek orderly resolution of the dispute with BMO that arose upon Farrell's acquisition of AEL. Thus, appellees had an opportunity through their union to persuade the AFL-CIO Article XX arbitrator of any special circumstances warranting disregard of the "accretion doctrine." But the arbitrator held that the doctrine was controlling and that, since the MMP contract provided for accretion whereas the BMO contract did not, the MMP agreement survived. No other administrative forum was readily available to resolve this dispute that had importance not only to the interested parties but to others similarly situated throughout the nation. Of course, we are not bound by the ruling of the AFL-CIO arbitrator. But we do take notice that the Article XX proceeding and application of the "accretion doctrine" provided a means of avoiding precisely the sort of interunion rivalry and possible labor strike that the national labor laws were designed to prevent. Should we find an overriding First Amendment right here, we can imagine that whenever a smaller number of vessels, or even one vessel, accretes into a larger fleet, the supervisors aboard the acquired vessel(s) could demand an election to determine what union represented the majority. Where such a doctrine would lead us is difficult to foresee, for to carry it a step further, any time a new supervisor was hired, or existing supervisors changed union allegiances, they would be able to call for new elections, citing their freedom of association rights. These considerations are certainly cognizable by the courts in determining the substantiality of an assertion of a First Amendment right. See Abood v. Detroit Board of Education, supra, 431 U.S. at 220-23, 97 S.Ct. at 1791-1793.
 
 
 38
 Finally, if the election ordered by the district court were held, and BMO won, the MMP-Farrell agreement would then be abrogated and MMP would lose its bargaining status. In the absence of any other agreement, and Farrell could not be required to enter into one, the Farrell deck officers and engineers other than appellees, including those former BMO members who joined MMP, could lose their benefits under the MMP-Farrell agreement. Here, as in the case of International Organization of Masters, Mates and Pilots v. NLRB (Cove Tankers Corp.), 575 F.2d 896, 905 (D.C. Cir. 1978), whatever burdens are imposed on First Amendment associational rights by the statutory exemption of supervisors from coverage under the NLRB are outweighed by the countervailing governmental interests.
 
 
 39
 We accordingly reverse the judgment below.
 
 
 
 [1]
 The first claim asserted that defendant appellants committed an unfair labor practice, both under the National Labor Relations Act, 29 U.S.C. § 158, and as a matter of federal common law. This claim was rejected, Jensen v. Farrell Lines, Inc., 477 F.Supp. 335, 344-45 (S.D.N.Y.1979), because appellees are supervisors and hence not employees under the Act, 29 U.S.C. § 152(3), and because federal common law compels no such result. See generally NLRB v. Yeshiva University, --- U.S. ----, 100 S.Ct. 856, 63 L.Ed.2d 115 (1980). Whether appellees as members of a "labor organization" are entitled to allege unfair labor practices on the part of employer Farrell, under 29 U.S.C. § 158(a)(3), is not before us, since they have not appealed this part of the decision below, 477 F.Supp. at 344
 The second claim asserted that BMO breached its duty of fair representation by not raising certain legal issues during the Article XX proceeding and by ultimately recognizing and accepting the MMP-Farrell contract. The court found against plaintiff-appellees in each instance. Id. at 348-50.
 
 
 [2]
 See generally Seatrain Shipbuilding Corp. v. Shell Oil Co., --- U.S. ----, ----, 100 S.Ct. 800, 808, 63 L.Ed.2d 36 (1980) ("Central to the legislative scheme (of the Merchant Marine Act, 1936) was the creation of an arsenal of grant and loan programs for use in the Secretary's efforts to stimulate domestic construction and make operation by domestic crews competitive.")
 
 
 [3]
 Since damages are not sought, it is unnecessary to determine whether a direct right of action for damages lies in the case of a First Amendment violation as it does in the case of a Fourth, Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), or a Fifth, Davis v. Passman, 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979), Amendment violation. Other circuits have found such a right of action. See Dellums v. Powell, 566 F.2d 167, 194-95 (D.C. Cir. 1977), cert. denied, 438 U.S. 916, 98 S.Ct. 3146, 57 L.Ed.2d 1161 (1978); Yiamouyiannis v. Chemical Abstracts Service, 521 F.2d 1392, 1393 (6th Cir. 1975) (per curiam), cert. denied, 439 U.S. 983, 99 S.Ct. 573, 58 L.Ed.2d 654 (1978); Paton v. La Prade, 524 F.2d 862, 869-70 (3d Cir. 1975)
 
 
 [4]
 Jackson v. Metropolitan Edison Co., 419 U.S. 345, 352, 95 S.Ct. 449, 454, 42 L.Ed.2d 477 (1974), cites several examples of such exercise: Evans v. Newton, 382 U.S. 296, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966) (municipal park); Terry v. Adams, 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953) (election); Marsh v. Alabama, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946) (company town); and Nixon v. Condon, 286 U.S. 73, 52 S.Ct. 484, 76 L.Ed. 984 (1932) (election)
 
 
 [5]
 Professor Choper is critical of the Jackson state-function standard, finding it "an unduly narrow definition of what a governmental function is." Choper, Kamisar & Tribe, supra, at 271. He proposes that if a private organization has monopoly power, particularly under a grant of state authority, then it should be charged with the responsibilities of the state. Id
 
 
 [6]
 The Court's language is less than clear on the degree of direct connection required, if any, between the Government and the challenged activity of the private party to establish state action. The Court in Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972), appears to maintain the two separate analyses:
 However detailed this type of regulation may be . . ., it cannot be said to in any way foster or encourage racial discrimination. Nor can it be said to make the State in any realistic sense a partner or even a joint venturer in the club's enterprise.
 Id. at 176-77, 92 S.Ct. at 1973. Jackson v. Metropolitan Edison Co., supra, frames part of the state action question in terms of "a sufficiently close nexus between the State and the challenged action of the regulated entity." 419 U.S. at 351, 95 S.Ct. at 453.
 Our court has often, although not always, viewed the issues of nexus and an overall symbiotic relationship as separate. See Janusaitis v. Middlebury Volunteer Fire Dep't, 607 F.2d 17, 23 (2d Cir. 1979) (district court in error to extent that nexus requirement was injected into Burton -type analysis); Holodnak v. Avco Corp., 514 F.2d 285, 288 (2d Cir.), cert. denied, 423 U.S. 892, 96 S.Ct. 188, 46 L.Ed.2d 123 (1975). But cf. Graseck v. Mauceri, supra, 582 F.2d 203, 209 n.22 (2d Cir. 1978), cert. denied, 439 U.S. 1129, 99 S.Ct. 1048, 59 L.Ed.2d 91 (1979) (uncertain whether Burton 's "symbiotic relationship" analysis survives Jackson 's nexus test); Schlein v. Milford Hospital, Inc., 561 F.2d 427, 428-29 (2d Cir. 1977) (per curiam) (applying nexus test to state's involvement with particular challenged activities, citing Jackson and Powe v. Miles, 407 F.2d 73, 81 (2d Cir. 1968).
 
 
 [7]
 One commentator is critical of Babbitt for apparently "saying that the state does not have to meet any First Amendment burden at all, since it did not have to give the workers a bargaining representative with all this power." Choper, Kamisar & Tribe, The Supreme Court: Trends and Developments 1978-1979, at 318-19 (1979). Professor Tribe suggests that Arizona could not, for example, require all people voting for the bargaining representative to sign a loyalty oath to Arizona ideals, without violating the First Amendment. Id. at 318, 99 S.Ct. at 2319. That there may be some things Farrell, if subject to the First Amendment, would be constitutionally prohibited from doing in regard to union members does not mean that it would be constitutionally required to recognize only a majority-supported union