Barbara **BARNES**, May Bigtree, Donnal Cole, Martha Cook, Solomon Cook, Julius Herne, Richard L. Jock, Beulah Terrance, Carol Terrance and Hilda Smoke, Comprising the Concerned Committee of Enrolled Members, Plaintiffs,

v.

Reginald **WHITE**, Leonard Garrow, Rudolph Hart, Sr., Leonard Beaubien, Cecil Garrow and Francis Arquette, Defendants.

No. 80–CV–319.

United States District Court,
N. D. New York.

July 16, 1980.

O'Connell & Wolfe, J. Byron O'Connell, Plattsburgh, N. Y., for plaintiffs.

Arthur J. Gajarsa, Gajarsa, Liss & Conroy, Washington, D. C., James M. Reilly, Herzog, Nichols, Engstrom & Koplovits, Albany, N. Y., for defendants.

## MEMORANDUM—DECISION AND ORDER

McCURN, District Judge.

In this action for declaratory, injunctive and monetary relief brought under the Indian Civil Rights Act (ICRA), 25 U.S.C. § 1302 and 42 U.S.C. § 1983, plaintiffs, who are individual members of the St. Regis Mohawk Tribe, seek to represent a class consisting of all members of the Tribe who are being aggrieved by certain alleged acts of the defendant elected Tribal leaders.

The case is presently before the Court on plaintiffs' motion for a preliminary injunction and defendants' motion to dismiss pursuant to Rule 12(b)(1) and (6) on the grounds that the Court lacks jurisdiction over the subject matter or alternatively for failure to state a cause of action. At oral argument on the motions, held on May 13, 1980, the Court advised the parties, that since a decision in defendants' favor on their motion to dismiss would be dispositive of the action, a determination on that motion would be made before a hearing was scheduled on plaintiffs' request for injunctive relief.

## BACKGROUND

Defendants Rudolph Hart, Reginald White and Leonard Garrow are nominal chiefs of the St. Regis Mohawk Tribe. Defendants Cecil Garrow and Francis Arquette are nominal sub-chiefs of the Tribe and defendant Leonard Beaubien is the nominal clerk. Each was elected to office by the Tribal membership pursuant to the New York State Indian Law § 110.

On March 8, 1980, a recall vote was held and each of the defendants was voted out of office. The defendants, however, refused to step down. The State Indian Law does not contain any provision for recall votes. According to the plaintiffs, the defendants advised them that they would accept the decision of the Tribal membership at a second recall vote to be held at the March 29, 1980, Tribal meeting. At that meeting, the defendants were again voted out of office and again refused to step down.

Plaintiffs allege that the defendants, prior to the March 29th meeting, threatened the plaintiffs and their families with physical injury or loss of employment if they attended the recall meeting. In addition, plaintiffs claim that actual physical assaults

have been made on members who did participate in the recall vote.

The plaintiffs further assert that the defendants have refused to meet with them to attempt to work out the problems which quite clearly exist within the Tribe and have denied plaintiffs access to the Tribal meeting rooms through the use of an armed Tribal police force. Finally, plaintiffs contend that the defendants have threatened to terminate the receipt of federal funds, over which they as Tribal officials have control if plaintiffs continue to press for their removal.

In bringing this action, plaintiffs seek a declaration from the Court that the acts of the defendants complained of and set forth above, are illegal and unconstitutional as in violation of the ICRA as well as the plaintiffs' rights to freedom of speech, association, assembly, privacy, movement and petition granted under the First, Fourth, Fifth and Fourteenth Amendments to the Constitution of the United States.

Plaintiffs also ask the Court to enjoin the defendants from subjecting the plaintiffs to violence; from illegally arresting or detaining or in any manner limiting their freedom of movement except upon a legally executed arrest warrant; and from using their offices to manage federal funds so as to control the plaintiffs' exercise of their constitutional rights. Plaintiffs, in addition to seeking declaratory and injunctive relief, demand an award of compensatory damages of $10,000.00 each.

**1.** 8 U.S.C. § 1401(b) provides for United States citizenship to:
(b) a person born in the United States to a member of an Indian, Eskimo, Aleutian, or other aboriginal tribe: Provided, That the granting of citizenship under this subsection shall not in any manner impair or otherwise affect the right of such person to tribal or other property;

**2.** 28 U.S.C. § 1343(a) provides that:
(a) The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:
(1) To recover damages for injury to his person or property, or because of the deprivation of any right or privilege of a citizen of the United States, by any act done in furtherance of any conspiracy mentioned in section 1985 of Title 42 [42 USCS § 1985];

## DISCUSSION

Plaintiffs seek relief under both the ICRA and 42 U.S.C. § 1983 alleging jurisdiction pursuant to 8 U.S.C. § 1401(b) [1] and 28 U.S.C. § 1343.[2] In moving for dismissal of the complaint, defendants contend, and this Court agrees for the reasons set forth below, that no cause of action is available to the plaintiffs in this case under either the ICRA (25 U.S.C. § 1302) or 42 U.S.C. § 1983.

*The Indian Civil Rights Act*

■ The ICRA was enacted by Congress as a rider to the Civil Rights Act of 1968. Passage came as a result of Congressional investigations, hearings and studies which were commenced in 1961 in response to reports of the frequent denial of individual constitutional rights by tribal governments, particularly in the administration of tribal justice. See generally Burnett, *An Historical Analysis of the 1968 'Indian Civil Rights' Act*, 9 Harv.J. on Leg. 557 (1972).

Indian tribal governments "have historically been regarded as unconstrained by those constitutional provisions framed specifically as limitations on federal or state authority," *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 56, 98 S.Ct. 1670, 1676, 56 L.Ed.2d 106 (1978), and Title II of the ICRA at 25 U.S.C. § 1302 "rather than providing in wholesale fashion for the extension of constitutional requirements to tribal governments, as had been initially proposed, [Congress] selectively incorporated and in

(2) To recover damages from any person who fails to prevent or to aid in preventing any wrongs mentioned in section 1985 of Title 42 which he had knowledge were about to occur and power to prevent;.
(3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States;
(4) To recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights, including the right to vote.

some instances modified the safeguards of the Bill of Rights to fit the unique political, cultural and economic needs of tribal governments." *Id.* at 62, 98 S.Ct. at 1679.[3]

Prior to the decision of the Supreme Court in *Santa Clara,* while there was some doubt on the issue, numerous federal courts held that a private cause of action for injunctive and declaratory relief was available for violations of section 1302. All doubt was erased in *Santa Clara,* with the Court finding that no private cause of action for those types of relief was available under the section.

In reaching that conclusion, the court carefully reviewed the legislative history of the Act which revealed that:

> Two distinct and competing purposes are manifest in the provisions of the ICRA: In addition to its objective of strengthening the position of individual tribal members vis-a-vis the tribe, Congress also intended to promote the well-established federal "policy of furthering Indian self-government." *Morton v. Mancari,* 417 U.S. 535, 551, 94 S.Ct. 2474, 2483, 41 L.Ed.2d 290 (1974)

*Santa Clara Pueblo v. Martinez, supra,* 436 U.S. at 62, 98 S.Ct. at 1679. Examining the situation in light of the dual objectives, the Court found that "[c]reation of a federal cause of action for the enforcement of rights created in Title I, however useful it might be in securing compliance with § 1302, plainly would be at odds with the congressional goal of protecting tribal self-government." *Id.* at 64, 98 S.Ct. at 1680.

The Court's reluctance to allow a private cause of action under § 1302 was reinforced by the legislative history underlying 25 U.S.C. § 1303 which provides that:

> [t]he privilege of the writ of habeas corpus shall be available to any person, in a court of the United States, to test the legality of his detention by order of an Indian tribe.

Reviewing the history of section 1303, the Court found that it suggested that:

> Congress' provision for habeas corpus relief, and nothing more, reflected a considered accommodation of the competing goals of "preventing injustices perpetrated by tribal governments, on the one hand, and, on the other, avoiding undue or precipitous interference in the affairs of the Indian people." Summary Report 11.

*Id.* at 66, 98 S.Ct. at 1681.

Plaintiffs have failed to demonstrate that this case either by its facts or applicable law falls outside of the clear holding of *Santa Clara.* To the contrary, the papers thus far before the Court in this lawsuit

---

**3.** The full text of 25 U.S.C. § 1302 is as follows:

§ 1302. Constitutional rights

No Indian tribe in exercising powers of self-government shall—

(1) make or enforce any law prohibiting the free exercise of religion, or abridging the freedom of speech, or of the press, or the right of the people peaceably to assemble and to petition for a redress of grievances;

(2) violate the right of the people to be secure in their persons, houses, papers, and effects against unreasonable search and seizures, nor issue warrants, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the person or thing to be seized;

(3) subject any person for the same offense to be twice put in jeopardy;

(4) compel any person in any criminal case to be a witness against himself;

(5) take any private property for a public use without just compensation;

(6) deny to any person in a criminal proceeding the right to a speedy and public trial, to be informed of the nature and cause of the accusation, to be confronted with the witnesses against him, to have compulsory process for obtaining witnesses in his favor, and at his own expense to have the assistance of counsel for his defense;

(7) require excessive bail, impose excessive fines, inflict cruel and unusual punishments, and in no event impose for conviction of any one offense any penalty or punishment greater than imprisonment for a term of six months or a fine of $500, or both;

(8) deny to any person within its jurisdiction the equal protection of its laws or deprive any person of liberty or property without due process of law;

(9) pass any bill of attainder or ex post facto law; or

(10) deny to any person accused of an offense punishable by imprisonment the right, upon request, to a trial by jury of not less than six persons.

indicate that this is precisely the type of intratribal controversy which the Supreme Court in *Santa Clara* stressed should be left to tribal members to resolve without judicial interference.

## 42 U.S.C. § 1983

Perhaps realizing that the relief which they seek would be unavailable through a direct claim under the ICRA plaintiffs have also alleged a claim under 42 U.S.C. § 1983 which provides in pertinent part that:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

A claim upon which relief may be granted under 42 U.S.C. § 1983 must embody two elements which are necessary for recovery. As stated by the Supreme Court in *Adickes v. Kress & Co.*, 398 U.S. 144, 150, 90 S.Ct. 1598, 1604, 26 L.Ed.2d 142 (1970):

First, the plaintiff must prove that the defendant has deprived him of a right secured by the "Constitution and laws" of the United States. Second, the plaintiff must show that the defendant deprived him of this constitutional right "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory." This second element requires that the plaintiff show that the defendant acted "under color of law."

Plaintiffs have alleged constitutional violations under the First, Fourth, Fifth and Fourteenth Amendments and statutory violations of the rights granted them under 25 U.S.C. § 1302. However, assuming arguendo that plaintiffs' claims satisfy the first element necessary under § 1983, their claim for relief under that section must still fall for failure to satisfy the second.

The Second Circuit, in *Jensen v. Farrell Lines, Inc.*, 625 F.2d 379, (2d Cir., 1980) stated that "the concept of what constitutes state action is a blurred one that the Supreme Court itself has had trouble clarifying." *Id.*, 625 F.2d at 384. The Court in *Jensen*, did, however, suggest two general approaches which have been used by the Supreme Court in determining whether seemingly private conduct is actually state action.

The first is the state-function approach "in which courts must find that the conduct of the private actor is equivalent to the performing of a state function or is traditionally associated with sovereignty." *Id.* at 384. Satisfaction of the state-function approach requires that the private entity "exercise powers 'traditionally exclusively reserved to the State.' [*Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 352, 95 S.Ct. 449, 454, 42 L.Ed.2d 477 (1974)]." *Id.* at 384. That requirement is clearly not met in this case.

The St. Regis Mohawk Tribe, like other Indian tribes, is a quasi-sovereign entity, *Morton v. Mancari*, 417 U.S. 535, 554, 94 S.Ct. 2474, 2484, 41 L.Ed.2d 290 (1974), which while no longer "possessed of the full attributes of sovereignty," retain the power of "regulating their internal and social relations." *United States v. Kagama*, 118 U.S. 375, 381–382, 6 S.Ct. 1109, 1112–1113, 30 L.Ed. 228 (1886).

Recently, the Supreme Court explained in *United Sates v. Wheeler*, 435 U.S. 313, 323, 98 S.Ct. 1079, 1086, 55 L.Ed.2d 303 (1978) that:

The sovereignty that the Indian tribes retain is of a unique and limited character. It exists only at the sufferance of Congress and is subject to complete defeasance. But until Congress acts, the tribes retain their existing sovereign powers. In sum, Indian tribes still possess those aspects of sovereignty not withdrawn by treaty or statute, or by implication as a necessary result of their dependent status.

See also *Oliphant v. Suquamish Indian Tribe*, 435 U.S. 191, 98 S.Ct. 1011, 55

L.Ed.2d 209 (1978).[4] As a result of federal control over Indian tribes, there have been instances, as pointed out by plaintiffs, in which tribal governments have been viewed as mere instrumentalities of the federal government. See e. g. *Colliflower v. Garland*, 342 F.2d 369 (9th Cir. 1965) (habeas corpus alleging illegal and unconstitutional confinement by tribal court which was held to function in part as a federal agency).

However, the state is in an entirely different position than the federal government with relation to Indian tribes. State control over Indian tribes within its borders is severely limited to those powers which are expressly given the state by Congress, *Williams v. Lee*, 358 U.S. 217, 221, 79 S.Ct. 269, 271, 3 L.Ed.2d 251 (1959), and tribes are not even subject to the laws of a state except insofar as the Untied States has given its consent.[5] *Worcester v. Georgia*, 31 U.S. (6 Pet.) 515, 560, 8 L.Ed. 483 (1832).

The State of New York is not excepted from the rule, and the State's relationship with the St. Regis Indian Tribe is subject to the overriding authority of the federal government. *Tuscarora Nation of Indians v. Power Authority*, 257 F.2d 885, 888–891 (2d Cir. 1958), rev'd. on other grounds 362 U.S. 99, 80 S.Ct. 543, 4 L.Ed.2d 584 (1960); *Seneca Constitutional Rights Organization v. George*, 348 F.Supp. 51 (W.D.N.Y.1972). Thus it is absolutely clear that the defendant tribal officials are not performing a function which is "traditionally exclusively reserved to the State," *Jackson v. Metropolitan Edison Co., supra*, 419 U.S. at 352, 95 S.Ct. at 454, since any attempt by the State to govern the internal affairs of the St. Regis tribe would be blatantly contrary to established federal law and policy.

The second approach suggested by the Second Circuit in *Jensen* for determining the presence of state action is:

> to examine the conduct of the private actor and ask whether the state and the private actor have a "symbiotic relationship," [*Jackson v. Metropolitan Edison Co., supra*, 419 U.S. at 357, 95 S.Ct. at 456] making them so significantly involved with one another as to render the private actor subject to the constitutional responsibilities of the state. . . . A related inquiry asks "whether there is a sufficiently close nexus between the . . challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself." *Jackson v. Metropolitan Edison Co., supra*, 419 U.S. at 351, 95 S.Ct. at 453.

*Jensen v. Farrell Lines, Inc., supra*, at 384.

Plaintiffs in alleging the presence of state action, appear to rely primarily upon the fact that the defendant Tribal officials were elected under provisions contained in the New York State Indian Law. There is no question but that the State Indian Law at section 110 provides for the election of St. Regis chiefs, sub-chiefs and clerks,[6] while section 108 sets forth voter qualifica-

---

4. As is clear from the Court's discussion of 25 U.S.C. § 1302, the present Congressional policy, reflected in recent judicial decision, is to encourage tribal self-government and independence. This policy must, of course, be given serious consideration in determining whether there is the requisite state action in this case.

5. The tribal-state relationship is based upon the principles of "federal pre-emption of state control over Indian affairs and tribal political independence." McCoy, *The Doctrine of Tribal Sovereignty: Accommodating Tribal, State, and Federal Interests*, 13 Harv.Civil Rights-Civil Liberties L.Rev. 357, 377 (1978). Both of these concepts were first discussed in *Worcester v. Georgia, supra*.

6. Section 110 of the Indian Law provides that:
   The election of the Saint Regis tribe of Indians shall be held annually on the first Saturday in June. At each election there shall be elected by a plurality of the votes cast by the qualified voters of such tribe, one chief and one subchief thereto, each of whom shall hold office for a term of three years.
   At each third annual election dating from that held in the year eighteen hundred and ninety-eight, there shall be elected by a plurality of the votes cast by the qualified voters of said tribe, a clerk, who shall hold office for a term of three years.
   A successor to such clerk shall be elected at the annual election occurring next prior to the expiration of his term of office. The terms of office of all officers of the Saint Regis tribe shall commence at twelve o'clock noon on the first day of July succeeding the election at which they are elected.

tions and sections 111 and 112 contain the procedures to be followed in the election of those officials.

In addition, sections 100–107 of the Indian Law outline certain of the powers and obligations of the elected tribal officers, including the handling of state annuities (§ 100); the general responsibilities of the clerk and the chiefs for Tribal money (§ 101); the allotment of land to Tribe members (§ 102); the general authority of the chiefs with regard to the cutting and sale of timber and the illegal sales thereof (§§ 103–105); the handling of Tribal disputes by the chiefs sitting as the Tribal council (§ 106); and the general authority of the council (§ 107).

Aside from the aforementioned areas, however, the State Indian Law asserts no control over the elective St. Regis government. Thus, the Court must determine whether the State election procedures and the provisions dealing with the powers and obligations of the officials elected pursuant to those procedures gives rise to the type of "symbiotic relationship" envisioned for a finding of state action or provides a sufficient nexus so as to make the acts of the defendants attributable to the state.

Plaintiffs contend that the state law mandated election of Tribal officers makes the St. Regis Mohawk Tribe unique among Indian tribes in New York State and probably the whole United States. This claim, at least with regard to New York State is unfounded, since the Indian Law at §§ 41 and 42 also provides for the election of tribal officers for the Seneca Indian Nation.[7]

In any event, as both sides to this lawsuit readily admit, the state law involved was enacted at the request of the members of the St. Regis Tribe in the late Nineteenth century. Thus, the legislation was enacted merely as an accommodation to the Tribe and not in an attempt to assert control over its membership.[8]

In light of the limited impact of the legislation on the governing of the St. Regis Tribe by the elected officials, it does not, in the opinion of this Court, result in the type of "symbiotic" relationship intended by the Supreme Court in *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 725, 81 S.Ct. 856, 862, 6 L.Ed.2d 45 (1961), the case in which the test was first applied and in which state action was found where:

> the State [had] so far insinuated itself into a position of interdependence with [the privately owned restaurant] that it must be recognized as a joint participant in the challenged activity . . . .

Nor does the Indian Law provide a sufficient nexus for finding state action. While it is true that the defendants might not be Tribal officers but for the election provisions contained in the Indian Law, the actions complained of do not involve specific powers granted under that law.[9] Rather, it is clear that the plaintiffs' complaint stems from an intratribal dispute which federal policy dictates should be handled within the Tribe and not by this Court.

Since plaintiffs have failed to establish a claim under either the ICRA or 42 U.S.C. § 1983, it is not necessary for the Court to decide plaintiffs' motion for a preliminary

---

7. The District Court in a § 1983 action brought against officials of the Seneca Indian Nation, found a lack of state action on the part of those officials without discussion of the election provisions applying to that Nation. *Seneca Constitutional Rights Organization v. George, supra.*

8. Since the State's authority over Indian tribes within its borders is limited to the extent previously discussed, the St. Regis Mohawks would presumably be free to alter the statutory election procedure should the Tribal membership choose to do so.

9. The statutory regulation of a private entity by the state does not by itself provide a sufficient basis for a finding of state action either under the "symbiotic relationship" or "nexus" approach. *Jackson v. Metropolitan Edison Co., supra; Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972). Therefore, the fact that the State Indian Law sets forth the previously enumerated powers and obligations of the elected Tribal leaders does not mandate a finding of state action in this case.

injunction and the complaint in this action is hereby dismissed.

It is so ordered.