JOU–JOU DESIGNS, INC.; Coco Boutique, Inc.; Topaz Boutique, Inc.; and Topaz Boutique of Lexington Avenue, Inc., Plaintiffs,

v.

INTERNATIONAL LADIES GARMENT WORKERS UNION, AFL–CIO; Sportswear Joint Board, International Ladies Garment Workers Union; Local 23–25, International Ladies Garment Workers Union; Local 155, International Ladies Garment Workers Union; and General Trades Employees Union, Local 5A, AFL–CIO, Defendants.

No. 80 Civ. 3028–CSH.

United States District Court,
S. D. New York.

June 12, 1980.

Herman E. Cooper, P.C., New York City, for plaintiffs; Herman E. Cooper, Jonathan L. Sulds, New York City, of counsel.

Chaikin & Chaikin, New York City, for defendants Sportswear Joint Board, ILG-WU, Local 23–25, ILGWU, and Local 155, ILGWU; Eric B. Chaikin, Max Zimny, New York City, Seth Kupferberg, of counsel.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

Plaintiff Jou-Jou Designs, Inc. ("Jou-Jou") and three affiliated companies sue to enjoin defendant labor unions from participating in an inter-union arbitration under Article XX of the AFL-CIO Constitution. Jurisdiction in this Court is asserted on the basis of §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2. In addition to an injunction, plaintiffs pray for a declaration that the behavior of certain union defendants is in restraint of trade and violative of the Sherman Act, and demand actual damages, to be trebled. A second claim, based upon pendent jurisdiction, seeks a declaration that the same defendants acted in tortious interference with plaintiffs' contractual relations, and prays for comparable injunctive relief and actual damages. Venue is laid under 28 U.S.C. § 1391(b).

The arbitration, if not enjoined, will determine whether one union's "Hazantown" agreement with Jou-Jou violates the AFL-CIO proscriptions on interfering with the established bargaining or work relationship of another union. Plaintiffs allege the arbitration to be part and parcel of a course of conduct by the ILGWU defendants violative of the Sherman Act under the rationale of *Connell Construction Co., Inc. v. Plumbers & Steamfitters Local Union No. 100*, 421 U.S. 616, 621–2, 95 S.Ct. 1830, 1834–1835, 44 L.Ed.2d 418 (1975); and, on a separate theory, violative of rights said to be conferred on Jou-Jou by *NLRB v. Plasterers' Local 79*, 404 U.S. 116, 92 S.Ct. 360, 30 L.Ed.2d 312 (1971).

The parties' thorough written submissions and oral arguments at two hearings on plaintiffs' motion for a preliminary injunction reveal that the decisive questions of law arise from undisputed facts. No evidentiary hearing is required, and the case is ripe for final decision.[1]

Finding no viable antitrust claim, and no authority to enjoin defendants' activities,

---

1. Counsel for all parties agreed at the hearing that an evidentiary hearing would serve no purpose. *See, e. g., Jacobson & Co., Inc. v. Armstrong Cork Co.*, 548 F.2d 438, 442 (2d Cir. 1977).

we dissolve the temporary restraining order previously entered, deny the injunction, and dismiss the complaint.

## I.

Plaintiff Jou-Jou, a New York corporation, is engaged in the apparel and clothing industry within the Southern District of New York, operating as a jobber of junior sportswear.[2] In keeping with the common practice in this branch of the garment industry, Jou-Jou does not produce or manufacture the garments it sells. Rather, Jou-Jou designs sample garments or patterns, which it furnishes to outside contractors together with material, and manufacturing specifications. Jou-Jou's garments are then made to its order by the outside contractors; upon redelivery Jou-Jou sells these garments to retailers. Jou-Jou employs directly, that is in its "inside" shop, approximately six workers who include sample or pattern makers and shipping and receiving clerks. None of Jou-Jou's production is carried on by these "inside" workers; all production is by workers employed by Jou-Jou's contractors, working in the contractors' "outside" shops.[3]

On May 5, 1978 Jou-Jou and Local 155 of the ILGWU entered into a jobber's agreement,[4] known in garment industry parlance as a "Hazantown" agreement.[5] The Jou-Jou/Local 155 Hazantown agreement[6] recognized that "the Employer [Jou-Jou] and its contractors are jointly engaged in an integrated production effort and, as such, have a close unity of interest and, in any labor dispute, are not neutrals with respect to each other; and . . . the Union [Local 155] represents the workers in many such contractors' shops, and has collective bargaining agreements with their employers and desires to provide and assure employment for such workers." In pertinent part, the agreement obligated Jou-Jou: (1) to use, with certain exceptions, only outside contractors having collective bargaining agreements with Local 155, or with the latter's consent, those having such agreements with other ILGWU locals or affiliates; and (2) to make certain employee benefit payments required under the outside contractors' collective bargaining agreements with ILGWU locals. The contract contained a no strike clause and bound the parties to arbitrate disputes related to the agreement. With respect to duration and renewal, the agreement provided:

**2.** Jou-Jou and the other three named plaintiffs, also New York corporations, are owned by the same individual stockholders. Complaint ¶ 3.

**3.** The development of this "integrated production" aspect of the New York garment industry is recounted in Judge Weinfeld's opinion in *Greenstein v. Nat'l Skirt & Sportswear Ass'n, Inc.*, 178 F.Supp. 681, 687–88 (S.D.N.Y.1959), *appeal dismissed*, 274 F.2d 430 (2d Cir. 1960). The subject was discussed in some detail during the congressional debates on the Labor Management Reporting and Disclosure Act of 1959, reproduced at 2 NLRB-Legislative History (1959) pp. 1377, 1385, 1576, 1680, 1708. In brief, the industry developed in this fashion when union attempts to organize garment workers met with management resistance. Manufacturers transformed themselves into jobbers and farmed out their production work to non-union outside contractors that sprang up to meet the manufacturing demand. The fierce competition among these contractors was made possible by the substandard wages paid their unorganized workers. The unions responded by picketing jobbers to obtain agreements binding them to use only unionized contractors. Congressional concern for the garment workers unions' ability to continue organ-

izing outside contractors' employees by picketing jobbers led to enactment of the garment industry proviso of § 8(e) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 158(e). *See* note 5, *infra.*

**4.** The ILGWU defendants' factual assertions with respect to the prior relationship between Local 155 and Jou-Jou, *see* Defendants' Brief at pp. 2–3 and Affidavit of Eric B. Chaikin, dated June 4, 1980, at ¶ 3, have not been addressed by the plaintiffs, and are irrelevant to the issues before me on this application.

**5.** The name derives from a case in which the Second Circuit held that nonrecognitional union picketing of a garment industry jobber to secure such an agreement—the device by which organization of the outside contractors' employees *is achieved—is protected under the* garment industry proviso of § 8(e) of the NLRA, 29 U.S.C. § 158(e). *Danielson v. Joint Board*, 494 F.2d 1230 (2d Cir. 1974). *See also, Hazantown, Inc.*, 212 NLRB 735 (1974).

**6.** The agreement is reproduced as Exhibit D to the Affidavit of Max Zimny, dated June 4, 1980.

"10. This agreement shall be effective as of the day and year first above written [i. e., May 5, 1978] and shall continue in full force and effect until the 31st day of July, 1979, and from year to year thereafter, unless at least sixty (60) days prior to such expiration date or subsequent anniversary thereof either party gives written notice to the other of its desire to modify or terminate this agreement."

The Jou-Jou/Local 155 Hazantown agreement did not purport to affect Jou-Jou's relations with its inside employees. Indeed, during the initial term of that agreement, the inside employees were not represented by any union. However, in February 1979 Local 155 apparently expressed a desire to negotiate with Jou-Jou concerning those inside employees. In this connection Local 155 wrote to Jou-Jou on May 11, 1979 as follows:

"As you undoubtedly know, our current collective labor agreement is scheduled to expire on July 31, 1979. As a condition for the renewal of the contractual rela-. tionship, the Union will request various modifications.

"Please let us know when it will be convenient for you to meet with us for the purpose of negotiating the new terms. We trust the the [sic] harmonious relations which have existed between us will continue." [7]

Negotiations concerning renewal of the Hazantown agreement and coverage for Jou-Jou's inside employees presumably went forward, for on July 5, 1979 Jou-Jou's then-counsel wrote to Local 155 to acknowledge agreement on the terms of a contract, which would include the inside employees. That letter [8] also made reference to Local 155's consent to Jou-Jou's continued use of a certain outside contractor.

A final integrated agreement was apparently contemplated [9] but never consummated, because on July 9, 1979 Local 5A of the

General Trades Employees Union, an affiliate of the United Brick and Clay Workers of America, AFL–CIO, filed a petition with the National Labor Relations Board ("NLRB") requesting an election to determine whether it should be certified as the bargaining representative of Jou-Jou's inside employees. Shortly thereafter, Local 155 informed the NLRB by letter of July 17, 1979 [10] that it was withdrawing its interest in representing Jou-Jou's inside employees but that "we do have a Union agreement with the firm known as a Hazentown [sic] Agreement which requires the firm to use only union contractors."

Counsel for Jou-Jou wrote to Local 155 on July 25, 1979. That letter [11] recounted the events leading to the agreement respecting the inside employees, noted the pending Local 5A petition for election and concluded:

"In light thereof, the contract between your Union and Jou Jou Designs, Inc. will, of course, terminate on July 31, 1979 and will not renew itself in light of the foregoing."

Counsel for Local 155 responded:

"As you are well aware, the agreement we have with Jou Jou Designs is a Hazentown [sic] Agreement which requires the firm to use only Union contractors. The fact that another Union represents Jou Jou Design's inside shop is totally irrelevant.

"Furthermore, we consider the contract between Local 155, I.L.G.W.U. and Jou Jou Designs renewed and we plan to hold the firm to all the terms and conditions of the agreement." [12]

Jou-Jou's counsel replied:

"I am in receipt of your letter dated July 26, 1979 regarding [Jou-Jou].

"I do not agree with your conclusion that the contract you refer to in your letter has renewed itself for the reasons set

7. Affidavit of Jonathan L. Sulds, dated June 5, 1980, at Exhibit C.

8. Affidavit of Eric B. Chaiken, dated June 4, 1980, at Exhibit C.

9. Id.

10. Id., Exhibit D.

11. Id., Exhibit E.

12. Id., Exhibit F.

forth in my letter to Local 155 dated July 25, 1979."[13]

Counsel for the ILGWU defendants assert, and plaintiffs do not appear to dispute, that between July 31, 1979 and December 1979 Jou-Jou continued to make payments to ILGWU employee benefit funds on behalf of its outside contractors, in conformity with the May 5, 1978 Hazantown agreement.

On or about August 1, 1979, Local 155 began to picket Jou-Jou to compel adherence to the Hazantown agreement. In response Jou-Jou filed with the NLRB an unfair labor practice charge against Local 155, asserting that the union's picketing was recognitional and proscribed by Section 8(b)(7) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 158(b)(7). The NLRB refused to issue a complaint, concluding:

"The evidence does not tend to establish that the above-named Union violated the National Labor Relations Act as alleged by you by its picketing of Jou Jou Designs, Inc., the Employer herein. Assuming, arguendo, that on July 3, 1979, the Union may have expressed an interest in becoming the collective-bargaining representative of employees of the Employer, it clearly disclaimed any such interest both orally and in writing on July 17, 1979. No evidence was offered, and none was adduced by the investigation, tending to show that the Union has acted in

any manner inconsistent with this disclaimer. Under the circumstances herein, the burden cannot be met of establishing that an object of the Union's picketing which began on about August 1, 1979, is proscribed by Section 8(b)(7) of the Act. Rather, it would appear that said picketing is in furtherance of the Union's effort to secure a renewal of a 'jobber's agreement' with the Employer which expired on July 31, 1979. Thus, the legend on the picket signs noted the absence of a jobber's agreement as the reason for the picketing, there is no evidence of any organizational activity by the pickets and as noted above there also is no evidence of any present recognitional objective. Accordingly, the picketing engaged in does not violate the Act. See: *Joint Board of Coat, Suit and Allied Garment Workers Union, ILGWU, AFL–CIO (Hazantown, Inc.)*, 212 NLRB 735. I therefore am refusing to issue a complaint in this matter."[14]

At about the time Local 155 commenced picketing Jou-Jou, the representation election respecting the inside employees went forward. No objections to that election having been filed, on August 7, 1979 the NLRB certified the results of the election and certified Local 5A as the collective bargaining representative for Jou-Jou's inside employees. That same day, Jou-Jou and Local 5A entered into a collective bargaining agreement covering Jou-Jou's inside employees[15] and a separate Hazantown agreement.[16] The latter was virtually iden-

---

13. *Id.*, Exhibit G.

14. *Id.*, Exhibit H.

15. The original collective bargaining agreement between Jou-Jou and Local 5A, reproduced as Exhibit E to the Max Zimny Affidavit, provided with respect to subcontracting:

"*SECTION XI*

\* \* \* \* \* \*

"*SUBCONTRACTING*

"The EMPLOYER shall be permitted to continue to have its work performed by other companies that it is now doing business with. If in the future it seeks to have its work performed by other companies, it shall first request permission of the Union."

However, on August 9, 1979, the parties allegedly amended the provision to read:

"The EMPLOYER shall subcontract its work only to shops which have a collective bar-

gaining agreement with Local 5A. However, if the Employer finds union shops are unavailable or unable to perform the Employer's work, either from the point of skill or price, the Employer shall be permitted to subcontract its work to any other shop whether union or not."

Counsel for the ILGWU defendants were understandably puzzled at oral argument by the apparent discrepancies in the subcontracting clause, since the collective bargaining agreement provided to them by Local 5A in connection with the Article XX proceeding contained only the first above-quoted language. *See* Affidavit of Edward Schwartz, dated June 9, 1980 and exhibit thereto. *See also* Reply Affidavit of Max Zimny, dated June 11, 1980.

16. Max Zimny Affidavit, Exhibit C.

tical to the Local 155 Hazantown agreement with Jou-Jou, with respect to the use of outside contractors and employee benefit fund payments, except, of course, that Jou-Jou bound itself to deal only with Local 5A rather than ILGWU outside shops. At some point thereafter Local 155 ceased picketing Jou-Jou.

The situation remained quiet until March 1980 when ILGWU Local 23–25 entered the picture. At that time Local 23–25 was engaged in a dispute with an outside contractor known as Tomlino, the union asserting that Tomlino had repudiated its collective bargaining agreement with the ILGWU local in favor of Local 5A. Local 23–25 had commenced picketing Tomlino and had filed with the NLRB unfair labor practice charges against both Tomlino and Local 5A. The Board issued a complaint on those charges, which is presently pending.[17] Local 23–25 had also sued Jou-Jou and Local 5A in New York State Supreme Court, claiming an illegal conspiracy and tortious interference with the Local 23–25/Tomlino collective bargaining agreement. When Local 23–25 learned that Tomlino was performing production work for Jou-Jou, the union demanded a Hazantown agreement from Jou-Jou, at the same time disclaiming any interest in representing Jou-Jou's inside employees.[18] The demand was not met and Local 23–25 commenced picketing Jou-Jou; Local 155 joined the picketing to further its own Hazantown demands, an objective Local 23–25 is said to have embraced. Local 23–25's picketing was the subject of an injunctive action brought by Jou-Jou in New York State Supreme Court, removed to this Court and subsequently remanded upon Judge Pollack's conclusion that Jou-Jou had established a prima facie case of violent picketing, the enjoining of which was viewed as an appropriate matter for state police power regulation.[19] The State Supreme Court's subsequent grant of injunctive relief against the picketing is now on appeal before the Appellate Division. The ILGWU defendants assert that they first learned of the Jou-Jou/Local 5A Hazantown agreement in the context of that state court suit.

Shortly after Local 23–25 commenced picketing Jou-Jou, the latter filed charges against that union with the NLRB, alleging violations of §§ 8(b)(1)(A), 8(b)(4)(D) and 8(b)(7)(C) of the NLRA, 29 U.S.C. § 158.[20] One month later, Jou-Jou voluntarily withdrew the charges.[21] On March 27, 1980, Local 155 also filed with the Board unfair labor practice charges against Jou-Jou asserting (1) a refusal to bargain with Local 155 respecting the Hazantown agreement; (2) domination and interference with the administration of Local 5A; and (3) violations arising from the relationship among Jou-Jou, Local 5A and Tomlino.[22] Those charges are presently under investigation by the Board.

Finally, on April 10, 1980 Local 155 caused the ILGWU, its parent organization, to commence a proceeding under Article XX of the AFL–CIO Constitution, charging that Local 5A had violated Local 155's established bargaining and work relationship with Jou-Jou by virtue of securing its own Hazantown agreement.[23] Counsel for the

17. Eric B. Chaiken Affidavit, Exhibit I.

18. Jonathan L. Sulds Affidavit, Exhibit E.

19. The transript of the hearing before Judge Pollack in *Jou-Jou Designs, Inc. v. Local 23–25,* 80 Civ. 1782(MP), is reproduced as Exhibit G to the Jonathan L. Sulds Affidavit.

20. Eric B. Chaiken affidavit, Exhibits J & K.

21. *Id.,* Exhibit L.

22. *Id.,* Exhibit M.

23. The charges were asserted under Sections 2 and 3 of Article XX. Max Zimny Affidavit, Exhibit A. In pertinent part, Article XX provides:

"SETTLEMENT OF INTERNAL DISPUTES
"Section 1. The principles set forth in this Article shall be applicable to all affiliates of this Federation, and to their local unions and other subordinate bodies.
"Sec. 2. Each affiliate shall respect the established collective bargaining relationship of every other affiliate. No affiliate shall organize or attempt to represent employes [sic] as to whom an established collective bargaining relationship exists with any other affiliate. For purposes of this Article, the term, 'established collective bargaining relationship' means any situation in which an affiliate, or any local or other subordinate body thereof, has either (a) been recognized by the employer (including any governmental agency) as the collective bargaining representative for

**1382**

ILGWU defendants assert repeatedly that that proceeding in no way concerns or seeks to disturb the collective bargaining agreement between Local 5A and Jou-Jou respecting the latter's inside employees. Rather, the thrust of the Article XX proceeding is to further ILGWU efforts to enforce or obtain a Hazantown agreement with Jou-Jou; if the ILGWU wins the arbitration Local 5A may be impelled by the threat of interunion sanctions to forego its Hazantown relationship with Jou-Jou, leaving the employer open to renewed ILGWU Hazantown demands. It is this Article XX proceeding (to which Jou-Jou is not and cannot be made a party, and which is sheltered from judicial review [24]) that Jou-Jou seeks to enjoin here. A hearing on the ILGWU's Article XX complaint has been held and concluded. No decision has issued. The ILGWU defendants have been temporarily restrained from prosecuting further the Article XX proceeding pending this decision; and counsel for Local 5A has represented to the Court that neither that local

nor its parent organization will take further action in that connection in the interim.

## II.

Jou-Jou contends that the ILGWU defendants' behavior violates §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2.[25] These defendants respond that the labor laws exempt their activities from antitrust scrutiny or condemnation. We are thus confronted, as many courts have been, with the interaction of antitrust policy and labor policy, expressed in statutes and Supreme Court decisions. The accommodation between these policies, characterized by one commentator as "intrinsically incompatible," [26] presents "a troublesome and unruly issue." *Commerce Tankers v. National Maritime Union of America*, 553 F.2d 793, 801 (2d Cir. 1977), quoting Meltzer, *Labor Unions, Collective Bargaining and the Antitrust Laws*, 32 U.Chi.L.Rev. 659 (1965).

Certain labor union activity is exempt from federal antitrust law, and the district courts' injunctive powers in aid thereof, by reason of statutes: §§ 6 and 20 of the Clayton Act, 15 U.S.C. § 17 and 29 U.S.C. § 52,[27] and the Norris-LaGuardia

the employes [sic] involved for a period of one year or more, or (b) been certified by the National Labor Relations Board or other federal or state agency as the collective bargaining representative for the employes [sic]. "Sec. 3. Each affiliate shall respect the established work relationship of every other affiliate. For purposes of this Article, an 'established work relationship' shall be deemed to exist as to any work of the kind which the members of an organization have customarily performed at a particular plant or work site, whether their employer is the plant operator, a contractor, or other employer. No affiliate shall by agreement or collusion with any employer or by the exercise of economic pressure seek to obtain work for its members as to which an established work relationship exists with any other affiliate, except with the consent of such affiliate. This section shall not be applicable to work in the railroad industry." *Id.*, Exhibit B.

**24.** AFL CIO Constitution, Art. XX § 20, *id.*

**25.** Section 1 provides in pertinent part: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal: . . ." 15 U.S.C. § 1.
Section 2 provides:
"Every person who shall monopolize, or attempt to monopolize, or combine or conspire

with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding one million dollars if a corporation, or, if any other person, one hundred thousand dollars, or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court." 15 U.S.C. § 2.

**26.** St. Antoine, Connell: *Antitrust Law at the Expense of Labor Law*, 62 Va.L.Rev. 603, 604 (1976).

**27.** Section 6 of the Clayton Act provides:
"The labor of a human being is not a commodity or article of commerce. Nothing contained in the antitrust laws shall be construed to forbid the existence and operation of labor, agricultural, or horticultural organizations, instituted for the purposes of mutual help, and not having capital stock or conducted for profit, or to forbid or restrain individual members of such organizations from lawfully carrying out the legitimate objects thereof; nor shall such organizations, or the members thereof, be held or construed to be illegal combinations or conspiracies in restraint of trade, under the antitrust laws."
Section 20 provides in part:

Act, 29 U.S.C. §§ 101–115.[28] In *United States v. Hutcheson*, 312 U.S. 219, 231, 61 S.Ct. 463, 466, 85 L.Ed. 788 (1941), the Court summarized the statutory scheme:

"Therefore, whether trade union conduct constitutes a violation of the Sherman Law is to be determined only by reading the Sherman Law and § 20 of the Clayton Act and the Norris-LaGuardia Act as a harmonizing text of outlawry of labor conduct."

In *Connell Construction Co., Inc. v. Plumbers & Steamfitters Local Union No. 100*, 421 U.S. 616, 621–2, 95 S.Ct. 1830, 1835, 44 L.Ed.2d 418 (1975), the Court said of the Clayton and Norris-LaGuardia Act provisions:

"These statutes declare that labor unions are not combinations or conspiracies in restraint of trade, and exempt specific union activities, including secondary picketing and boycotts, from the operation of the antitrust laws."

While these particular statutes "do not exempt concerted action or agreements between unions and nonlabor parties," *id.* at 622, 95 S.Ct. at 1835, the Supreme Court has recognized that a proper accommodation between congressional labor and antitrust policy "requires that some union-employer agreements be accorded a limited nonstatutory exemption from antitrust sanctions"; however, the nonstatutory exemption does not apply "when a union and a nonlabor party agree to restrain competition in a business market." *Id.* at 622–3, 95 S.Ct. at 1835; compare *Meat Cutters v. Jewel Tea Co.*, 381 U.S. 676, 85 S.Ct. 1596, 14 L.Ed.2d 640 (1965) with *Allen Bradley v. Electrical Workers*, 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939 (1945).

"No restraining order or injunction shall be granted by any court of the United States, or a judge or the judges thereof, in any case between an employer and employees, or between employers and employees, or between employees, or between persons employed and persons seeking employment, involving, or growing out of, a dispute concerning terms or conditions of employment, unless necessary to prevent irreparable injury to property, or to a property right, of the party making the application, for which injury there is no adequate remedy at law, and such property or property right must be described with particularity in the application, which must be in writing and sworn to by the applicant or by his agent or attorney."

**28.** Section 1 of the Norris-LaGuardia Act provides:

"No court of the United States, as defined in this chapter, shall have jurisdiction to issue any restraining order or temporary or permanent injunction in a case involving or growing out of a labor dispute, except in a strict conformity with the provisions of this chapter; nor shall any such restraining order or temporary or permanent injunction be issued contrary to the public policy declared in this chapter."

Section 13 contains definitions, the ones particularly pertinent to the issues herein being the following:

"When used in this chapter, and for the purposes of this chapter—

"(a) A case shall be held to involve or to grow out of a labor dispute when the case involves persons who are engaged in the same industry, trade, craft, or occupation; or have direct or indirect interests therein; or who are employees of the same employer; or who are members of the same or an affiliated organization of employers or employees; whether such dispute is (1) between one or more employers or associations of employers and one or more employees or associations of employees; (2) between one or more employers or associations of employers and one or more employers or associations of employers; or (3) between one or more employees or associations of employees and one or more employees or associations of employees; or when the case involves any conflicting or competing interests in a 'labor dispute' (as defined in this section) of 'persons participating or interested' therein (as defined in this section).

\* \* \* \* \* \*

"(c) The term 'labor dispute' includes any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee."

Section 4 provides that no court of the United States "shall have jurisdiction to issue any restraining order or temporary or permanent injunction in any case involving or growing out of any labor dispute" to prohibit certain specified acts. Section 5 provides that, in any event, the courts lack jurisdiction to issue a temporary or permanent injunction unless specified procedural steps are followed.

Finally, it is arguable that specific provisions in the labor statutes, by sanctioning union activities, protect them from antitrust attack. In the case at bar, we are concerned in that regard with the "garment industry proviso" enacted in 1959 as a part of § 8(e) of the National Labor Relations Act, 29 U.S.C. § 158(e).[29]

We consider the instant case against this background of congressional enactment and Supreme Court authority, and in the light of other pertinent factors.

■ First, it is the law of this Circuit that a garment workers union does not commit an unfair labor practice by nonorganizational picketing of a jobber, in an effort to obtain an agreement limiting the jobber to union contractors. That is the holding of *Danielson, supra*, Judge Friendly's definitive opinion which gave the "Hazantown agreement" its name. See n. 5, *ante*. In *Danielson*, as in the case at bar, the ILGWU coupled its efforts to obtain a jobber's agreement with an express disclaimer of interest in *organizing* the jobber's "inside" employees. *Danielson* concluded that the garment industry proviso of § 8(e) barred the NLRB's petition to enjoin the picketing under § 10(1); after reviewing the legislative history of § 8(e), Judge Friendly wrote:

"In sum, the General Counsel's effort to stretch § 8(b)(7)(C) to prevent a garment workers union from non-organizational picketing of a primary employer, although the proviso to § 8(e) was designed

to permit it to picket a secondary one, would indeed keep the word of promise to the ear but break it to the hope. The time when courts would construe a statute that way has long since passed." 494 F.2d at 1237–8.

■ Second, the statutory exemptions of labor activity from antitrust law extend to union conduct motivated by interunion rivalry. In *Hutcheson, supra*, two unions whose members were employees of a brewing company disputed the issue of which employees should erect and dismantle machinery. Although the company had agreements with both unions, whereby the members of one were given the disputed jobs and the other agreed to submit all disputes to arbitration, that other union repented of its bargain, refused to arbitrate, and began to picket. The Government obtained an indictment for criminal violation of the Sherman Act. Construing § 20 of the Clayton Act, the Court held that the union's activities could not give rise to an antitrust violation:

"There is nothing remotely within the terms of § 20 that differentiates between trade union conduct directed against an employer because of a controversy arising in the relation between employer and employee, as such, and conduct similarly directed but ultimately due to an internecine struggle between two unions seeking the favor of the same employer. Such strife between competing unions has been an obdurate conflict in the evolution of

**29.** Section 8(b) defines unfair labor practices on the part of unions. Section 8(e) provides:

"It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person, and any contract or agreement entered into heretofore or hereafter containing such an agreement shall be to such extent unenforcible and void: *Provided,* That nothing in this subsection shall apply to an agreement between a labor organization and an employer in the construction industry relating to the contracting or subcontracting of work to be done at the site of the construc-

tion, alteration, painting, or repair of a building, structure, or other work: *Provided further,* That for the purposes of this subsection and subsection (b)(4)(B) of this section the terms 'any employer', 'any person engaged in commerce or an industry affecting commerce', and 'any person' when used in relation to the terms 'any other producer, processor, or manufacturer', 'any other employer', or 'any other person' shall not include persons in the relation of a jobber, manufacturer, contractor, or subcontractor working on the goods or premises of the jobber or manufacturer or performing parts of an integrated process of production in the apparel and clothing industry: *Provided further,* That nothing in this subchapter shall prohibit the enforcement of any agreement which is within the foregoing exception."

so-called craft unionism and has undoubtedly been one of the potent forces in the modern development of industrial unions. These conflicts have intensified industrial tension but there is not the slightest warrant for saying that Congress has made § 20 inapplicable to trade union conduct resulting from them." 312 U.S. at 232, 61 S.Ct. at 466.

The purpose and effect of the Norris-LaGuardia Act, explicated by the *Hutcheson* Court at 234–236, 61 S.Ct. at 468, reinforced the conclusion that "§ 20 removes all such allowable conduct from the taint of being a 'violation of any law of the United States,' including the Sherman Law." *Id.* at 236, 61 S.Ct. at 468. And the Court commenced its decision in *Hutcheson* with the brisk observation that "[c]oncededly an injunction either at the suit of the Government or of the employer could not issue." *Id.* at 227, 61 S.Ct. at 464.

Third, the Article XX proceeding embodied in the AFL-CIO Constitution, which the present plaintiffs seek to enjoin, has been recognized as "a means of avoiding precisely the sort of interunion rivalry and possible labor strife that the national labor laws were designed to prevent." *Jensen v. Farrell Lines, Inc.,* 625 F.2d 379 at 389 (2d Cir. 1980) (holding that First Amendment claims of freedom of association asserted by members of union losing Article XX representation arbitration were not actionable); *cf. Green v. Obergfell,* 121 F.2d 46 (D.C.Cir. 1941). In *NLRB v. Plasterers' Local Union No. 79,* 404 U.S. 116, 133, 92 S.Ct. 360, 370, 30 L.Ed.2d 312 (1971), it was said that "this Court has frequently approved an expansive role for private arbitration in the settlement of labor disputes . . ."

Plainly these factors, singly and in concert, militate against Jou-Jou's effort to enjoin the present Article XX proceeding. But Jou-Jou insists it is entitled to injunctive relief. The ILGWU defendants' actions are said to violate the Sherman Act under the rationale of *Connell, supra*; and Jou-Jou argues that the Norris-LaGuardia Act does not apply to bar an injunction because the controversy does not involve or grow out of a "labor dispute" under § 13 of that statute, 29 U.S.C. § 113.

Addressing these points in order, the extension of the *Connell* rationale to the instant case is essential to Jou-Jou's jurisdictional theory; no other authority is cited which would condemn, under antitrust principles, the defendant unions' participation in the Article XX proceeding. But *Connell* is not in point. The case condemns, as violative of the Sherman Act, an agreement entered into between a general contractor (under protest) and a building trades union, which required the contractor to subcontract only with firms that were parties to a collective bargaining agreement with the union. The Court reviewed labor's statutory and nonstatutory exemptions from the antitrust laws. The statutes did not protect the union's conduct in *Connell* because "[t]hey do not exempt concerted action or agreements between unions and nonlabor parties." 421 U.S. at 622, 95 S.Ct. at 1835. Nor did the Court-fashioned, "limited nonstatutory exemption from antitrust sanctions" apply:

"Labor policy clearly does not require, however, that a union have freedom to impose direct restraints on competition among those who employ its members. Thus, while the statutory exemption allows unions to accomplish some restraints by acting unilaterally, e. g., *Federation of Musicians v. Carroll,* 391 U.S. 99 [88 S.Ct. 1562, 20 L.Ed.2d 460] (1968), the nonstatutory exemption offers no similar protection when a union and a nonlabor party agree to restrain competition in a business market. . . .

"In this case Local 100 used direct restraints on the business market to support its organizing campaign. The agreements with Connell and other general contractors indiscriminately excluded nonunion subcontractors from a portion of the market, even if their competitive advantages were not derived from substandard wages and working conditions but rather from more efficient operating methods. Curtailment of competition based on efficiency is neither a goal of federal labor policy nor a necessary effect of the elimination of competition among workers. Moreover, competition based on efficiency is a positive value that the

antitrust laws strive to protect." *Id.* at 622–3, 95 S.Ct. at 1835.

The union in *Connell* sought refuge in the "construction industry proviso" of § 8(e) of the National Labor Relations Act. The Court rejected the argument. The legislative history underlying the construction industry proviso showed that Congress focused:

> ". . . on the problems of picketing a single nonunion subcontractor on a multiemployer building project, and the close relationship between contractors and subcontractors at the jobsite. Congress limited the construction-industry proviso to that single situation, allowing subcontracting agreements only in relation to work done on a jobsite. *In contrast to the latitude it provided in the garment-industry proviso*, Congress did not afford construction unions an exemption from § 8(b)(4)(B) or otherwise indicate that they were free to use subcontracting agreements as a broad organizational weapon." *Id.* at 629–30, 95 S.Ct. at 1838–39 (emphasis added).

The Court expanded further on the distinction between the construction and labor industries in a significant footnote:

> "As noted above, supra, at 1837–1839, the garment-industry proviso reflects different considerations. The text of the proviso and the treatment in congressional debates and reports suggest that Congress intended to authorize garment workers' unions to continue using subcontracting agreements as an organizational weapon. See *Danielson v. Joint Board*, 494 F.2d 1230 (CA2 1974) (Friendly, J.)." *Id.* at 633, 95 S.Ct. at 1840 n. 13.

The Court held in *Connell* that, in the circumstances of the case, the union was not immune from federal antitrust statutes. Whether the subcontracting agreement actually violated the Sherman Act was left for decision on remand.

Unlike *Connell*, plaintiffs in the case at bar do not attack a presently existing agreement between a union and a nonlabor party. In plaintiffs' view, the ILGWU defendants have no contract with Jou-Jou. The agreement whose operation is sought to be enjoined is the compact between all AFL-CIO affiliates, set forth in Article XX of the Constitution, to arbitrate jurisdictional disputes. No case holds that such an interunion arbitration agreement, designed as the Second Circuit observed in *Jensen, supra*, to avoid labor strife, violates the antitrust laws.[30]

If the analysis stopped there, such absence of authority and countervailing public policy would be sufficient to deny Jou-Jou's claim. But Jou-Jou looks further, to the Hazantown agreement the ILGWU defendants hope to obtain following an Article XX award in their favor. "Under *Connell*," plaintiffs argue (reply brief at p. 18), "the agreement the ILGWU defendants seek and their efforts to obtain it may be the basis of an antitrust suit." Accepting *arguendo* that Jou-Jou may challenge on antitrust grounds a prospective agreement, which will not even come into existence if the ILGWU *loses* the Article XX arbitration,[31] the broader scope of the § 8(e) garment industry proviso protects a contract which, under the more narrow construction industry proviso as construed in *Connell*, may be vulnerable to attack. As noted *ante*, the *Connell* Court in text and footnote stressed the greater latitude afforded unions by the garment industry proviso. Jou-

---

**30.** While the ILGWU defendants comprise the parent union and two of its affiliated locals, their actions must be regarded as unilateral action within the context of antitrust law. In *Connell* the Court acknowledged that the statutory exemption "allows unions to accomplish some restraints by acting unilaterally," 421 U.S. 622, 95 S.Ct. 1835, citing *Federation of Musicians v. Carroll*, 391 U.S. 99, 88 S.Ct. 1562, 20 L.Ed.2d 460 (1968), where the challenged conduct was that of a parent union and one of its locals.

**31.** "Combinations are no less unlawful because they have not as yet resulted in restraint. An agreement or combination to follow a course of conduct which will necessarily restrain or monopolize a part of trade or commerce may violate the Sherman Act, whether it be 'wholly nascent or abortive on the one hand, or successful on the other.'" *Associated Press v. U. S.*, 326 U.S. 1, 12, 65 S.Ct. 1416, 1421, 89 L.Ed. 2013 (1945), quoting *U. S. v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 225, 60 S.Ct. 811, 846, 84 L.Ed. 1129 (1940).

Jou argues in its brief (pp. 23–25) that § 8(e), "to which the proviso is appended, is directed to entering into an agreement or contract"; and, since the ILGWU unions have no contract with Jou-Jou, "the proviso does not apply" (although, in Jou-Jou's perception, the proviso does serve to protect its Hazantown agreement with Local 5A). This argument falls in the face of the Court's apparent recognition in *Connell* that by the garment industry proviso "Congress intended to authorize garment workers' unions to continue using subcontracting agreements *as an organizational weapon.*" 421 U.S. 633 n. 13, 95 S.Ct. 1840 (emphasis added). The *Connell* Court immediately follows this statement with a reference to *Danielson, supra,* where the union's picketing of a jobber with whom it did not have a contract was held authorized by the proviso.

It is of no legal significance that, unlike the jobber in *Danielson,* Jou-Jou claims to have a previously existing, bargained-for Hazantown agreement with Local 5A. *United States v. Hutcheson, supra,* teaches that § 20 of the Clayton Act exempts from antitrust sanctions coercive picketing which arises from internecine union warfare.

Jou-Jou correctly cites *Connell* for the proposition that the labor law exemptions do not confer a blanket antitrust immunity. But the argument falls short of its mark because *Connell's* reasoning, while condemning the agreement involved therein, protects the agreement sought to be achieved here. A leading commentator analyzes *Connell* thus:

"Thus, the majority impliedly held that an antitrust exemption does not apply to all activities of a class regulated by labor law but only to activities approved and protected by labor law. Although the minority opinion argued vehemently that even assuming the majority to be right on the more specific statutory issues, the various strands of regulation constituted a sort of 'occupation of the field' by the labor statutes to the exclusion of the antitrust laws, the majority assumed almost without discussion that unless a particular practice is affirmatively sanctioned by labor law it is entitled to no exemption." Sullivan, *Handbook of the Law of Antitrust* (1977) at p. 730.

In the case at bar, the ILGWU's practice is "affirmatively sanctioned by labor law," and is thus entitled to antitrust exemption.[32]

■ While Jou-Jou's antitrust theory has sufficient substance to vest this Court with subject matter jurisdiction, *cf. Jensen, supra,* —— F.2d at ——, upon analysis it fails to state a claim upon which relief can be granted. Rule 12(b)(6), F.R.Civ.P.

Even if the complaint stated a viable antitrust claim, the Norris-LaGuardia Act deprives this Court of jurisdiction to enjoin the Article XX arbitration. In *Hutcheson, supra,* the Supreme Court found it unnecessary to discuss the self-evident proposition that Norris-LaGuardia foreclosed an injunction against picketing in furtherance of internecine union warfare. No reason appears why the Act should not apply to the peaceful resolution of rival union claims contemplated by Article XX. Despite Jou-Jou's contrary contention, the disputing unions' claims, and the interunion arbitration designed to resolve them, clearly involved a "labor dispute" under § 13 of the statute.

---

32. The concerted conduct of the ILGWU defendants cannot be regarded as a combination or conspiracy in restraint of trade under § 1 of the Sherman Act, since such conduct constitutes unilateral action by a union. See n. 30, *ante.* The sought-for jobber's agreement with Jou-Jou is an illegal contract in restraint of trade only if such a Hazantown agreement constitutes a *per se* violation of § 1. This proposition, implicit in Jou-Jou's argument if not expressly stated, finds no support in antitrust law, and, as demonstrated *ante,* runs counter to labor law. Thus no claim arises under § 1 of the Sherman Act; and, for comparable reasons, the facts do not support a claim of attempted monopolization under § 2, individually or as the result of combination or conspiracy.

Professor Sullivan, after reviewing the recent Supreme Court cases, sums them up thus: "In their totality these cases suggest both an analytical stance and an objective: to reconcile labor and antitrust policy where possible and, where not, to weigh claims of each and give way to the stronger." *Op. cit. supra* at p. 729.

In the case at bar, labor policy favoring the defendant unions' conduct clearly predominates.

That is the square holding of *Green v. Obergfell, supra,* in which the District of Columbia Circuit reversed the district court's injunction barring enforcement of a comparable American Federation of Labor interunion, representational arbitration. The Court of Appeals, stating that "[i]t would be difficult to imagine a case which more clearly involves a labor dispute within the meaning of the Norris-LaGuardia Act," 121 F.2d at 50, held that the district court exceeded its jurisdiction by disregarding the statutory procedures.

In the case at bar, we need not decide whether the Article XX arbitration falls, as the ILGWU defendants argue, within certain of the specific acts withdrawn from the district courts' equitable jurisdiction by § 4 of the Norris-LaGuardia Act. The procedural defects under § 7, fatal to the injunction in *Green v. Obergfell,* are equally apparent here.[33]

As an alternative basis to the jurisdictional obstacles under Norris-LaGuardia, the *Green* court went on to say:

"Each of the three major labor organizations which are parties to this controversy are voluntary, unincorporated associations; the American Federation of Labor is the parent and the other two are affiliated units of that Federation. It is a well recognized principle in the law of such voluntary associations that there shall be no judicial interference with intra-association affairs or determinations in the absence of special circumstances showing injustice or illegal action." *Id.* at 55.

Because the American Federation of Labor constitution and procedures bound the disputing unions to arbitrate their jurisdictional quarrel, the *Green* court articulated a broad basis for denying injunctive relief which would abrogate the process:

"Upon analysis of the applicable law and consideration of the facts, our conclusion, therefore, is that the American Federation of Labor acted within the scope of its delegated constitutional power, and that no contractual or other rights of the Brewery Workers Union were violated by its decision of 1933. This being true, there is no foundation for equitable relief, or reason for judicial interference, as regards any proper action by the Federation or the Teamsters Union in carrying out that decision." *Id.* at 68.

That salutary reasoning is fully applicable to the case at bar.

## CONCLUSION

We conclude that plaintiffs do not state a viable antitrust claim; that this Court has no power to enjoin the interunion arbitration; and that the ILGWU defendants are entitled to prevail on general principles of

**33.** In *Connell* the Court left open the effect of the Norris-LaGuardia Act upon the general contractor's request for a permanent injunction against picketing to coerce execution of the agreement; there was no picketing then in progress, and, "[i]f the agreement in question is held on remand to be invalid under federal antitrust laws, we cannot anticipate that Local 100 will resume picketing to obtain or enforce an illegal agreement." 421 U.S. at 637 n. 19, 95 S.Ct. at 1842. The circumstances are different in the case at bar, since the Article XX arbitration (the analogue to the picketing sought to be enjoined in *Connell*) is presently pending. Having held that the unions' conduct in the instant case does not violate the antitrust laws, perhaps we could also avoid the Norris-LaGuardia question; but it has been fully briefed and argued, and forms an alternative basis for decision. There is also something to be said for indicating this Court's view, in the event of an appeal.

We have also considered Jou-Jou's contention that, under principles of *res judicata,* the absence of a "labor dispute" is established by the prior proceedings before Judge Pollack of this Court, and the state court on remand (see text accompanying n. 19, *ante*), so as to preclude the application of Norris-LaGuardia. We have examined the transcript of the evidentiary hearing before Judge Pollack. While at times he spoke in rather broad phrases, Judge Pollack focused exclusively upon whether Local 23–25's picketing was violent or peaceful. That was the only issue before him. Concluding that Jou-Jou had shown the violent nature of the picketing, Judge Pollack remanded the case to the state courts, under settled authority. The issue whether the ILGWU unions' subsequent initiation of Article XX arbitration gives rise to a Norris-LaGuardia "labor dispute" (a question answered in the affirmative by *Green v. Obergfell, supra*) was not before Judge Pollack or the state courts, and *res judicata* does not apply.

equity.[34]  Plaintiffs' claim for antitrust damages is necessarily foreclosed by this decision.  We decline to retain pendent jurisdiction of the state law claims.[35]  While, in the press of preliminary injunction hearings, defendants have not filed a motion to dismiss the complaint under Rule 12(b), no useful purpose would be served by the formality.  Accordingly the Clerk is directed to dismiss the complaint.  No costs are awarded.

It is so ordered.

---

**34.** Jou-Jou's professed irreparable injury arising out of labor relations "instability," which the Court was initially inclined to accept, does not withstand further analysis.  There is no evidence that either Jou-Jou's "inside" employees or its contractors are in such a state of nervous tension, as the result of these events, that Jou-Jou's business has been adversely affected.

Jou-Jou further árgues that "[w]hat the ILGWU was unable to accomplish by enjoined violence, it seeks under Article XX" (reply brief at p. 2).  That is not necessarily a ground for condemnation;  the beating of swords into ploughshares is accepted social conduct.

In the view we take of the case, it is unnecessary to reach the issues said to arise under *NLRB v. Plasterers' Local 79*, 404 U.S. 116, 92 S.Ct. 360, 30 L.Ed.2d 312 (1971). .

**35.** *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966) ("Certainly, if the federal claims are dismissed before trial, even though *not insubstantial in a jurisdictional sense*, the state claims should be dismissed as well.").