JOU–JOU DESIGNS, INC.; Coco Boutique Inc.; Topaz Boutique, Inc.; and Topaz Boutique of Lexington Avenue, Inc., Plaintiffs-Appellants,

v.

INTERNATIONAL LADIES GARMENT WORKERS UNION, AFL–CIO; Sportswear Joint Board, International Ladies Garment Workers Union, AFL–CIO; Local 23–25, International Ladies Garment Workers Union; Local 155, International Ladies Garment Workers Union; and General Trades Employees Union, Local 5A, AFL–CIO, Defendants-Appellees.

No. 360, Docket 80–7588.

United States Court of Appeals, Second Circuit.

Argued Nov. 19, 1980.

Decided Feb. 25, 1981.

Jonathan L. Sulds, New York City (Herman E. Cooper, P.C., New York City, of counsel), for plaintiffs-appellants.

Max Zimny, New York City (Chaikin & Chaikin, Eric B. Chaikin, Seth M. Kupferberg, New York City, of counsel), for defendants-appellees.

Before MOORE, NEWMAN and KEARSE, Circuit Judges.

MOORE, Circuit Judge:

The origins of this case lie in the sweatshops of early Twentieth Century America. "It has its genesis in a fiercely competitive struggle by manufacturers of garments at the turn of the century which caught the workers in the industry, at that time mostly recently arrived immigrants, in between, depressed their wages and resulted in intolerable working conditions." *Greenstein v. National Skirt and Sportswear Association*, 178 F.Supp. 681, 687 (SDNY 1959), *appeal dismissed*, 274 F.2d 430 (2d Cir. 1960).

Low wages and bad working conditions spurred the workers in those sweatshops to organize and unionize.

"In an effort to avoid unionization, and to evade all direct responsibility to production employees, manufacturers who operated inside shops, the then prevalent method of manufacturing and marketing of garments, abandoned their shops. Instead they contracted out all or a part of the work to outside contractors whose employees worked on materials supplied by the manufacturers. And so the outside system of production came into being. These contractors generally were marginal operators without financial resources and again the worker was exploited." *Greenstein v. National Skirt and Sportswear Association*, 178 F.Supp. at 687.

The workers, however, responded with equal ingenuity and resolve. To achieve effective union representation, garment workers picketed and pressured jobbers, who controlled production, to farm out their work only to contractors who employed union workers. Union pressure would lead to an agreement between a jobber and a union to farm out production only to shops represented by that particular union. These

agreements are called "Hazantown Agreements", named after the jobber involved in the case in which this Circuit ruled that picketing to achieve them is not an unfair labor practice. *Danielson v. Joint Board*, 494 F.2d 1230 (2d Cir. 1974).

FACTS

Plaintiff Jou-Jou Designs, Inc. ("Jou-Jou") is engaged in the apparel and clothing industry within the Southern District of New York. Jou-Jou is a jobber, and does not produce or manufacture the garments that it sells. Instead, Jou-Jou designs sample garments and patterns, which it furnishes to outside contractors together with material and manufacturing specifications. Jou-Jou garments are then made by the outside contractors, delivered to Jou-Jou, and sold by Jou-Jou to retailers.

On May 5, 1978, Jou-Jou and Local 155 of the International Ladies Garment Workers Union (ILGWU), entered into a Hazantown Agreement. That agreement did not purport to affect Jou-Jou's relations with its six inside employees, who were not then represented by any union. In February, 1979, Local 155 expressed a desire to negotiate with Jou-Jou concerning representation of Jou-Jou's inside employees. Negotiations concerning renewal of the Hazantown Agreement and coverage of Jou-Jou's inside employees went forward. A final integrated agreement was apparently contemplated but never consummated.

The negotiations between Local 155 and Jou-Jou were derailed on July 9, 1979. On that day Local 5A of the General Trade Employees Union, an affiliate of the United Brick and Clayworkers Union of America, AFL–CIO, filed a petition with the National Labor Relations Board (NLRB) requesting an election to determine whether it should be certified as the bargaining representative of Jou-Jou's inside employees. Shortly thereafter, Local 155 informed the NLRB by letter that it was withdrawing its interest in representing Jou-Jou's employees, but that it did have a Hazantown Agreement with Jou-Jou.

The Hazantown Agreement between Local 155 and Jou-Jou provided that it would continue from July 31 to July 31, from year to year, automatically, unless either party gave notice 60 days prior to July 31 of its desire to terminate the Agreement. On July 25, 1979, only six days before July 31, Jou-Jou notified Local 155 of its desire to terminate the contract. Counsel for Local 155 responded by a letter stating that Local 155 considered the contract already renewed. Counsel for Jou-Jou wrote a letter disputing that contention.

On or about August 1, 1979, Local 155 began to picket Jou-Jou to compel adherence to the Hazantown Agreement. In response, Jou-Jou filed with the NLRB an unfair labor practice charge against Local 155, asserting that Local 155's picketing was recognitional and so proscribed by § 8(b)(7) of the National Labor Relations Act (NLRA), 29 U.S.C. § 158(b)(7). The NLRB refused to issue a complaint, concluding that the picketing was to secure a jobbers' agreement, and not to represent Jou-Jou's inside employees.

At about the time Local 155 commenced picketing at Jou-Jou, the representation election respecting the inside employees went forward. On August 7, 1979, the NLRB certified the results of the election, and certified Local 5A as the collective bargaining representative of Jou-Jou's inside employees. That same day, Jou-Jou and Local 5A entered into a collective bargaining agreement covering Jou-Jou's employees in a separate Hazantown Agreement. The new Hazantown agreement with Local 5A was essentially identical to the earlier Hazantown Agreement with Local 155. The major difference was that Jou-Jou bound itself to deal only with outside jobbers having labor relations with Local 5A of the General Trade Employees Union, rather than outside shops having labor relations with Local 155 of the ILGWU. Shortly thereafter, Local 155 ceased picketing Jou-Jou.

All was quiet from August, 1979 to March, 1980.

In March 1980, another ILGWU local became involved in the situation. Local 23–25 of the ILGWU became involved in a dispute with Jou-Jou and Local 5A, claiming that their pressure on a contractor (Tomlino) had led to that contractor's repudiating his contract with Local 23–25 and instead establishing labor relations with Local 5A. Local 23–25 began to picket Jou-Jou. Local 155 joined the picketing to further its own Hazantown demands, an objective Local 23–25 is said to have embraced. The picketing grew violent, and was enjoined in state court proceedings. Those state court proceedings were only one of the many NLRB and state court proceedings arising from the troubles delineated above.[1]

Finally, on April 10, 1980, Local 155 caused the ILGWU, its parent organization, to commence a proceeding under Article XX of the AFL–CIO constitution, charging that Local 5A had violated Local 155's established bargaining and work relationship with Jou-Jou. This proceeding in no way sought to disturb the collective bargaining agreement between Local 5A and Jou-Jou respecting Jou-Jou's inside employees. Since the ILGWU has won the arbitration, Local 5A might be impelled by the threat of inter-union sanctions to forgo its Hazantown relationship with Jou-Jou, leaving Jou-Jou open to renewed ILGWU Hazantown demands.

## DISCUSSION

Plaintiffs Jou-Jou and three affiliated companies allege that the efforts of Locals 23–25 and 155 to secure a Hazantown Agreement, and the initiation by Locals 155 and 23–25 of inter-union arbitration of the dispute between Locals 23–25 and 155 on the one side, and Local 5A on the other, violate the anti-trust laws. Federal jurisdiction is asserted on the basis of § 1 of the Sherman Act. Jou-Jou seeks treble damages and an injunction against the arbitration. A second claim, based on pendent jurisdiction, seeks a declaration that Locals 155 and 23–25 acted in tortious interference with plaintiffs' contractual relations, and seeks damages and injunctive relief. The District Court found no viable anti-trust claim and dismissed the complaint. (490 F.Supp. 1376 [SDNY 1980]). We affirm.

1. Hazantown Agreements were a logical focus of anti-trust attack; they are, after all, contracts in restraint of trade, and so seemingly violate § 1 of the Sherman Act. They exclude from the market contractors who are not affiliated with the union that has signed a Hazantown Agreement with the jobber. Similar agreements resulting from secondary pressure have been condemned in the construction industry. In *Connell Construction Company, Inc. v. Plumbers and Steamfitters Local Union No. 100*, 421 U.S. 616, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975), a building trades union supported its efforts to organize mechanical subcontractors by picketing certain general contractors. The union's sole objective was to compel the general contractors to agree that in letting subcontracts for mechanical work they would deal only with firms that were parties to the union's current collective bargaining agreement. The union disclaimed any interest in representing the general contractors' employees. The union stationed a single picket at one of the company's major construction sites. About 150 workers walked off the job, and construc-

---

1. Local 23–25 brought two actions. Local 23–25 filed unfair labor practice charges with the NLRB against the contractor (Tomlino) and Local 5A. The Board issued a complaint on those charges, which is presently pending. Local 23–25 also sued Jou-Jou and Local 5A in New York State Supreme Court, claiming an illegal conspiracy and tortious interference with the Local 23–25 contractor's (Tomlino's) collective bargaining agreement.

Jou-Jou also brought two actions. One action was successful in enjoining Local 23–25's picketing because of its violent nature. Jou-

Jou also filed NLRB charges against Local 23–25, which Jou-Jou has subsequently withdrawn voluntarily.

Local 155 filed unfair labor practice charges against Jou-Jou with the NLRB, alleging a refusal to bargain with Local 155 respecting the Hazantown Agreement, domination and interference with the administration of Local 5A, and violations arising from the relationship among Jou-Jou, Local 5A and Tomlino. Those charges are presently under investigation by the NLRB.

tion halted. Management signed the agreement the union had desired, but then sought to void the resulting agreement as an illegal restraint on competition.

The Supreme Court found an anti-trust violation.

"The agreements with Connell and other general subcontractors indiscriminately excluded nonunion subcontractors from a portion of the market, even if their competitive advantages were not derived from substandard wages and working conditions, but rather from more efficient operating methods. Curtailment of competition based on efficiency is neither a goal of federal labor policy nor a necessary effect of the elimination of competition among workers. Moreover, competition based on efficiency is a positive value that the antitrust laws strive to protect...." 421 U.S. at 623, 95 S.Ct. at 1835.

This agreement

"made nonunion subcontractors ineligible to compete for a proportion of the available work. This kind of direct restraint on the business market has substantial anti-competitive effects, both actual and potential, that would not follow naturally from the elimination of competition over wages and working conditions...." 421 U.S. at 625, 95 S.Ct. at 1836.

■ Such agreements are subject to anti-trust attack in the construction industry, except in very limited circumstances. Yet they are immune from anti-trust attack in the garment industry. That immunity stems from the NLRA, as amended by the Labor-Management Reporting and Disclosure Act of 1959, 29 U.S.C. § 158(e), which also provides a much more limited immunity for such agreements in the construction industry.[2] "The garment industry proviso differs significantly from the construction industry proviso which precedes it." *Danielson v. Joint Board*, 494 F.2d 1230, 1236 (2d Cir. 1974). "The text of the proviso and the treatment in Congressional debates and reports suggest that Congress intended to authorize garment workers unions to continue using subcontracting agreements as an organizational weapon. See *Danielson v. Joint Board*, 494 F.2d 1230 (CA2, 1974), Friendly, J." 421 U.S. at 633, n.13, 95 S.Ct. at 1840, n.13.[3] In the garment industry (unlike the construction industry), Hazan-

---

**2.** The construction industry proviso's authorization of otherwise illegal agreements "extends only to agreements in the context of collective bargaining relationships and in light of congressional references to the *Denver Buildings Trades* problem, possibly to common situs relationships on particular jobsites as well". *Connell*, 421 U.S. at 633, 95 S.Ct. at 1840.

**3.** The text of the proviso reads:
"It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person, and any contract or agreement entered into heretofore or hereafter containing such an agreement shall be to such extent unenforcible and void: *Provided,* That nothing in this subsection shall apply to an agreement between a labor organization and an employer in the construction industry relating to the contracting or subcontracting of work to be done at the site of the construction, alteration, painting, or repair of a building, structure, or other work: *Provided fur-*

*ther,* That for the purposes of this subsection and subsection (b)(4)(B) of this section the terms 'any employer', 'any person engaged in commerce or an industry affecting commerce,' and 'any person' when used in relation to the terms 'any other producer, processor, or manufacturer,' 'any other employer,' or 'any other person' shall not include persons in the relation of a jobber, manufacturer, contractor or subcontractor working on the goods or premises of the jobber or manufacturer or performing parts of an integrated process of production in the apparel and clothing industry: *Provided further,* That nothing in this subchapter shall prohibit the enforcement of any agreement which is within the foregoing exception."

The relevant Congressional debates and reports are at 105 Cong.Rec. 17327 (1959) (remarks by Sen. John Kennedy); *id.,* at 17381 (remarks by Sens. Javits and Goldwater); *id.,* at 15539 (memorandum by Reps. Thompson and Udall); *id.,* at 16590 (memorandum by Sen. Kennedy and Rep. Thompson); 2 NLRB, Legislative History of the Labor-Management Reporting and Disclosure Act of 1959, pp. 1377, 1385, 1576, 1708 (1959).

town Agreements are protected regardless of whether they are within the context of the collective bargaining relationship or restricted to a particular job site. They are "affirmatively sanctioned by labor law", Sullivan, *Handbook of the Law of Anti-Trust* (1977), p. 730, and so entitled to anti-trust exemption.

■ 2. Jou-Jou, however, attacks not an existing Hazantown Agreement but activity by Locals 23–25 and 155 to secure a Hazantown Agreement with Jou-Jou. Picketing to obtain a Hazantown Agreement is protected by the statutory exemption from the anti-trust laws in the Clayton Act, 15 U.S.C. § 17, 29 U.S.C. § 52 and the Norris-LaGuardia Act, 29 U.S.C. §§ 104–115. Those Acts "declare that labor unions are not combinations or conspiracies in restraint of trade, and exempt certain specific union activities, including secondary picketing and boycotts, from the operation of the antitrust laws", *Connell*, 421 U.S. at 621–22, 95 S.Ct. at 1834–1835. Congress intended that the Clayton Act would protect certain labor activities from anti-trust attack. When the Clayton Act was interpreted restrictively by the courts, Congress reaffirmed in the Norris-LaGuardia Act its earlier intent to exempt most labor activity from the anti-trust laws. *United States v. Hutcheson*, 312 U.S. 219, 236, 61 S.Ct. 463, 468, 85 L.Ed. 788 (1941).[4]

■ Those Acts are now construed to immunize one union's picketing an employer as part of a dispute over which of two unions is entitled to certain jobs, so long as the union acts in its self-interest and does not combine with non-labor groups. *United States v. Hutcheson*, 312 U.S. at 232, 61 S.Ct. at 466. The appellants argue that their complaint alleged that the union combined with a non-labor group, namely those subcontractors who would stand to gain if

the ILGWU unions secured a Hazantown Agreement, and that the District Court simply read this allegation out of the complaint. Yet the complaint in fact includes no allegation that the subcontractors conspired with the defendants. The implication that the subcontractors would benefit from the agreement is not an allegation that they conspired to achieve it. In the absence of such an allegation, we find the picketing by the defendants enjoys the protection of the Clayton and Norris-LaGuardia Acts.

3. The plaintiffs seek to distinguish this case from the ordinary case in which a union pickets to secure a Hazantown Agreement. They argue that the defendants are not protected by the statutory exemption discussed in *Hutcheson* because, in seeking a Hazantown Agreement, they sought to displace another union's Hazantown Agreement. Yet far from aiding the plaintiffs' argument, this distinction points up a fundamental flaw in the plaintiffs' case, the fact that these facts just do not ring of anti-trust. Disputes of this sort are part and parcel of industrial relations, and should not be the basis of anti-trust liability. In fact, the plaintiffs fail to allege any credible restraint of trade. Their attack is not on Jou-Jou's Hazantown Agreement with Local 5A—they do not seek relief from that agreement, which does restrain trade. Instead, their complaint is that Locals 155 and 23–25 tried to substitute themselves for Local 5A as the beneficiary of a Hazantown Agreement. Yet that effort, even if successful, would involve no net restraint of trade, but merely the substitution of one restraint of trade for another.

■ The complaint fails to state a claim upon which relief can be granted, since the plaintiffs fail to allege any credible restraint on trade, as required by § 1 of the

---

4. While picketing to obtain Hazantown Agreements is protected by the statutory exemption, Hazantown Agreements themselves do not come within the exemption granted by the Clayton and Norris-LaGuardia Acts. Those Acts do not exempt concerted actions or agreements between union and non-labor parties, *Connell, supra,* 421 U.S. at 622, 95 S.Ct. at

1835; *Mine Workers v. Pennington,* 381 U.S. 657, 662, 85 S.Ct. 1585, 1589, 14 L.Ed.2d 626 (1965), and Hazantown Agreements are by definition agreements between union and non-labor parties. Hazantown Agreements themselves must thus find anti-trust shelter in the garment industry proviso.

Sherman Act, 15 U.S.C. § 1, the jurisdictional basis of this lawsuit. This is not a federal anti-trust claim. It is essentially either a state claim for tortious interference with contractual relations, or an NLRB case. We agree with the District Court that appellants' pendent state law claim for tortious interference was properly dismissed, since the federal claim was dismissed before trial. *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966).

4. Appellants seek not only treble damages, but also seek to enjoin the AFL–CIO's arbitration of this dispute. The foundation of their demand for injunctive relief is the alleged anti-trust violation, a claim discussed and rejected above. There is thus no reason to grant the plaintiffs injunctive relief.

Nor do the federal courts have jurisdiction to afford these plaintiffs injunctive relief. The Norris-LaGuardia Act was "intended drastically to curtail the equity jurisdiction of federal courts in the field of labor disputes". *Green v. Obergfell*, 121 F.2d 46, 51–52 (D.C.Cir.1941). The Norris-LaGuardia Act denies the federal courts jurisdiction to issue an injunction against any lawful act "involving or growing out of a labor dispute". 29 U.S.C. § 107. The term "labor dispute" includes conflicts between employees, as in this case, and not only conflicts between employers and employees. *Green v. Obergfell*, 121 F.2d at 50. Since the plaintiffs have failed to make out a viable claim that this arbitration is unlawful, the federal courts lack not only cause but also the power to interfere with this arbitration.

Furthermore, special deference is to be afforded inter-union arbitration proceedings. The Supreme Court "has frequently approved an expansive role for private arbitration in the settlement of labor disputes...." *National Labor Relations Board v. Plasterer's Local Union No. 79*, 404 U.S. 116, 133, 92 S.Ct. 360, 370, 30 L.Ed.2d 312 (1971). Inter-union arbitration has been endorsed by this Court as "a means of avoiding precisely the sort of interunion rivalry and possible labor strife that the national labor laws were designed to prevent". *Jensen v. Farrell Lines, Inc.*, 625 F.2d 379, 389 (2d Cir. 1980). "It is a well recognized principle in the law of such voluntary associations that there shall be no judicial interference with intra-association affairs or determinations in the absence of special circumstances showing injustice or illegal action." *Green v. Obergfell*, 121 F.2d at 55. No injustice nor illegal action has been effectively alleged here.

*Affirmed.*